# In the United States Court of Federal Claims

No. 12-12 C

(E-Filed: January 15, 2013)

| | | |
|---|---|---|
| _____ | ) | |
| WESTLANDS WATER DISTRICT, | ) | |
| | ) | |
| | ) | Breach of Contract Claims; |
| Plaintiff, | ) | Declaratory Judgment; |
| v. | ) | Motion to Dismiss Under |
| | ) | RCFC 12(b)(1) and 12(b)(6) |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

Lawrence W. Treece, Denver, CO, for plaintiff.  Mark J. Mathews and Lauren E. Schmidt, Denver, CO, and David L. Bernhardt, Washington, DC, of counsel.

Katy M. Bartelma, Trial Attorney, with whom were Stuart F. Delery, Acting Assistant Attorney General, Jeanne E. Davidson, Director, and Bryant G. Snee, Deputy Director, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, DC, for defendant.  Shelly Randel and Amy Aufdemberge, Office of the Solicitor, United States Department of the Interior, Washington, DC, of counsel.

OPINION AND ORDER

HEWITT, Chief Judge

Westlands Water District (plaintiff or Westlands), a water district in the state of California, buys and distributes water from the San Luis unit of the Central Valley project, which is administered by the Bureau of Reclamation of the Department of the Interior (Interior).  Compl., Docket Number (Dkt. No.) 1, ¶¶ 2, 5, 12.  Westlands brings this action alleging various breaches of a purported contractual obligation of the United States government (defendant or the government) to provide drainage to Westlands, based on the government's failure to provide water drainage facilities and services.  See id. ¶¶ 5-7.

Specifically, plaintiff states six claims for relief.  The first two claims present alternative breach of contract theories:  (1) past breaches of express contractual drainage obligations, Compl. ¶¶ 131-36; or, in the alternative, (2) past breaches of implied contractual drainage obligations, id. ¶¶ 137-42.  The third, fourth and fifth claims are dependent on the court's finding a contractual duty to provide drainage:  (3) past breaches of implied contractual obligations of good faith and fair dealing, id. ¶¶ 143-50; (4) total breach of contract regarding drainage obligations, id. ¶¶ 151-56; and (5) anticipatory breach of contract regarding drainage obligations, id. ¶¶ 157-63.  Finally, plaintiff states an alternate claim for relief, should the court find neither a total nor anticipatory breach of contract, as alleged in claims four and five, respectively:  (6) declaratory judgment adjusting any amounts due by Westlands pursuant to present and future repayment contracts so that Westlands will not have to repay the government higher actual costs of construction under those contracts, as a result of inflation, than it would have had to pay if construction had not been delayed.  Id.  ¶¶ 164-76.  In connection with (and as a condition of) its claims for total breach and anticipatory breach, plaintiff also seeks a declaration of the severability of defendant's contractual obligation to provide water service from defendant's purported contractual obligation to provide drainage.  Id. ¶¶ 156, 163; Corrected Response to Motion to Dismiss (plaintiff's Response or Pl.'s Resp.), Dkt. No. 29, at 46.

Now before the court, in addition to plaintiff's Complaint, are:  Defendant's Motion to Dismiss, (defendant's Motion or Def.'s Mot.), Dkt. No. 12, filed May 21, 2012, and Appendix to Defendant's Motion to Dismiss (defendant's Appendix or Def.'s App.), Dkt. Nos. 12-1,-2; plaintiff's Response to Motion to Dismiss, Dkt. No. 18, filed August 20, 2012, which was superseded by plaintiff's Response, filed September 26, 2012; and Defendant's Reply in Support of Our Motion to Dismiss (defendant's Reply or Def.'s Reply), Dkt. No. 32, filed October 12, 2012.  Plaintiff also filed an Appendix in Support of Response to Motion to Dismiss, Dkt. Nos. 18-1 to 18-4, filed Aug. 20, 2012, which was superseded by plaintiff's Appendix in Support of Corrected Response to Motion to Dismiss (plaintiff's Appendix or Pl.'s App.), Dkt. Nos. 29-1 to 29-7, filed September 26, 2012.

Defendant argues that all six of plaintiff's claims must be dismissed pursuant to Rule 12 of the Rules of the United States Court of Federal Claims (RCFC), asserting that, under RCFC 12(b)(1), this court lacks jurisdiction over all of plaintiff's claims except claim five (anticipatory breach) and that, under RCFC 12(b)(6), plaintiff has failed to state a claim upon which relief can be granted with respect to all six claims.  Def.'s Mot. 1.

For the reasons set forth below, defendant's Motion is GRANTED.

2

I.      Background[1]

      A.      Creation of the San Luis Unit as Part of the Federal Reclamation Program

      1.      Relevant Federal Reclamation Laws[2]

In 1902, Congress created a "'reclamation fund'" in the Treasury--to be funded by public land sales--for "the construction and maintenance of irrigation works" to reclaim arid and semiarid lands in the western United States for productive use.  Reclamation Act of 1902 (1902 Act), ch. 1093, § 1, 32 Stat. 388 (codified as amended in scattered sections of 43 U.S.C.).  The Secretary of the Interior (the Secretary) received authority to contract for construction of such irrigation projects and to pay for them out of the newly created reclamation fund.  Id. § 4, 32 Stat. at 389.  However, these expenditures were meant to be reimbursed:  pursuant to the 1902 Act, equitably apportioned charges would be levied upon irrigated lands "with a view of returning to the reclamation fund the estimated cost of construction of the project."  Id.  After a "major portion" of the construction costs were paid, "management and operation of [the] irrigation works" would then "pass to the owners of the [irrigated] lands."  Id. § 6, 32 Stat. at 389.  "[T]itle to and the management and operation of the reservoirs . . . [would] remain in the Government until otherwise provided by Congress."  Id., 32 Stat. at 389.

Congress supplemented the 1902 Act with the Reclamation Project Act of 1939 (1939 Act), ch. 418, 53 Stat. 1187 (codified as amended at 43 U.S.C. §§ 485-485k (2006)), "to provide a feasible and comprehensive plan for the variable payment of construction charges on United States reclamation projects," id. § 1, 53 Stat. at 1187.  Specifically, the 1939 Act described two different contract schemes:  repayment contracts and water service contracts.  Id. § 9(d)-(e), 53 Stat. at 1195-96 (codified as amended at 43 U.S.C. § 485h(d)-(e)).  Generally, organizations contracting for water would be required to enter a repayment contract with the United States before any water could "be delivered for irrigation of lands in connection with any new project."  Id. § 9(d), 53 Stat. at 1195.  These repayment contracts would treat actual construction costs allocated to irrigation as "a general repayment obligation" to the United States.  Id. § 9(d)(3), 53 Stat. at 1195.  Repayment would "be spread in annual installments, of the number and amounts fixed by the Secretary, over a period not exceeding forty years."  Id.  "[T]he first annual

_____

[1] A table of contents appears at the end of this Opinion as Exhibit A.

[2] In describing the history of federal reclamation laws, the court cites to the applicable session laws.  However, in analyzing plaintiff's claims under current federal reclamation laws, the court cites to the relevant provisions as amended and codified in the United States Code.  The history of the federal reclamation program is also addressed briefly in Defendant's Motion to Dismiss (defendant's Motion or Def.'s Mot.), Docket Number (Dkt. No.) 12, at 2-3.

installment for any project contract unit" would accrue "on the date fixed by the Secretary, [either] in the year after the last year of the development period," or if there was no development period, "in the calendar year after the Secretary announce[d] that the construction contemplated in the repayment contract is substantially completed or . . . advanced to a point where delivery of water can be made to substantially all of the lands" in the contract unit. Id. § 9(d)(4), 53 Stat. at 1196.

In addition, the Secretary had discretion under the 1939 Act to enter water service "contracts to furnish water for irrigation purposes" for up to a forty-year period, "at such rates as in the Secretary's judgment will produce revenues at least sufficient to cover an appropriate share of the annual operation and maintenance cost and an appropriate share of such fixed charges as the Secretary deems proper." Id. § 9(e), 53 Stat. at 1196. Under a water service contract, payments would be due in advance of water delivery. Id. "[T]he costs of any irrigation water distribution works constructed by the United States in connection with the new project" would be covered by a separate repayment contract. Id.

2.      Construction of the San Luis Unit

Congress authorized the Secretary to construct the San Luis unit of the Central Valley project by passing the San Luis Act of 1960 (San Luis Act), Pub. L. No. 86-488, 74 Stat. 156; see Compl. ¶ 18. The San Luis unit was created with the "principal purpose of furnishing water for the irrigation of approximately five hundred thousand acres of land in Merced, Fresno, and Kings Counties, California." San Luis Act § 1(a), 74 Stat. at 156. As "an integral part of the Central Valley project," it would be subject to federal reclamation laws with respect to its construction, operation and maintenance. Id.

Under the terms of the San Luis Act, one condition precedent to construction of the San Luis unit was that the Secretary must have made adequate drainage provisions for the unit, either by securing a commitment from the State of California to provide for a master drainage outlet or by providing for construction of an interceptor drain by the federal government. See id. (stating that construction shall not commence until the Secretary has "received satisfactory assurance from the State of California that it will make provision for a master drainage outlet and disposal channel for the San Joaquin Valley, . . . which will adequately serve, by connection therewith, the drainage system for the San Luis unit or has made provision for constructing the San Luis interceptor drain to the delta designed to meet the drainage requirements of the San Luis unit"); Compl. ¶ 18. Initially, the State of California planned to collaborate with the federal government on a master drainage outlet to serve "the drainage needs of the San Luis Unit and other surrounding areas." Compl. ¶ 51. However, when the State of California later notified Interior that it would not construct a master drainage outlet, Interior agreed to construct an interceptor drain. Id. ¶¶ 19, 51; Def.'s Mot. 7.

4

Westlands began receiving water from the San Luis unit in late 1967. Compl. ¶ 20; Def.'s Mot. 5.

Construction of an interceptor drain began in 1968. Def.'s Mot. 7; see Compl. ¶ 51. The purpose of the interceptor drain was to receive drainage from local drainage systems, which it would then empty into the Sacramento/San Joaquin River Delta. Compl. ¶ 50; Def.'s Mot. 7. By 1975, less than half of the planned length of the interceptor drain had been completed, with the drain ending at the Kesterson Reservoir, about sixty miles north of Westlands. Compl. ¶ 51; Def.'s Mot. 7. The interceptor drain was never extended as planned; Interior suspended construction in 1975 owing to environmental concerns. Compl. ¶ 51; Def.'s Mot. 7.

Around that time, Interior began construction of a subsurface drainage system for Westlands, which was connected to the completed portion of the interceptor drain. Def.'s Mot. 7; see Compl. ¶ 52. Beginning in 1979 and continuing through 1985, this drainage system transported drainage from Westlands to the Kesterson Reservoir. Compl. ¶ 58; Def.'s Mot. 7. However, environmental concerns arose after high levels of selenium (a mineral contained in the drainage water) were found in ducks and embryonic deformities were found in shore birds at the Kesterson Reservoir. Compl. ¶¶ 60-61; see Def.'s Mot. 7. As a result, Westlands and Interior signed an agreement in 1985 to discontinue the flow of drainage water to the Kesterson Reservoir, and the Kesterson Reservoir and completed portion of the interceptor drain were closed. Compl. ¶¶ 64-65; Def.'s Mot. 7-8. The government has not provided for drainage from the Westlands water district "since the spring of 1986[,] when Westlands' drainage collector drains were plugged." Compl. ¶ 67.

Westlands continues to receive water pursuant to water service contracts with the government. See Def.'s Mot. 8 ("Westlands continues to receive [Central Valley Project] water."); Pl.'s App. 9-39 (2012 interim renewal contracts) (providing for water service into 2014).

B.    Contracts at Issue Between Westlands and the United States Government[3]

---

[3] The United States (defendant or the government) points out that Westlands Water District (plaintiff or Westlands) does not allege a breach of the 1985 agreement between plaintiff and defendant, see Def.'s Mot. 15 n.5, in which the parties agreed to discontinue the flow of drainage water to the Kesterson Reservoir, Compl. ¶ 65. The court agrees and does not consider whether the government breached any obligations under the 1985 agreement. Cf. Corrected Resp. to Mot. to Dismiss (plaintiff's Response or Pl.'s Resp.), Dkt. No. 29, at 1 n.1 (listing contracts "involved in this litigation" and not including the 1985 agreement in the list).

In addition, plaintiff appears to raise for the first time in its Response an allegation that the government has also breached obligations under a series of 2012 interim renewal contracts.

1.      1963 Water Service Contract

In 1963, Westlands signed a water service contract with Interior, pursuant to federal reclamation laws.  Compl. ¶¶ 29-30; Def.'s Mot. 5; see Def.'s App. A2-43 (Contract Between the United States and Westlands Water District Providing for Water Service (1963 Contract)).[4]  As a water service contract, the 1963 Contract is governed by 43 U.S.C. § 485h(e), where section 9(e) of the 1939 Act has been codified.  See Def.'s Mot. 3, 5.  Accordingly, rates under the 1963 Contract reflected the Secretary's judgment that such rates "will produce revenues at least sufficient to cover an appropriate share of the annual operation and maintenance cost and an appropriate share of such fixed charges as the Secretary deems proper." 1939 Act § 9(e), 53 Stat. at 1196 (codified as amended at 43 U.S.C. § 485h(e)).

The 1963 Contract provided that "the United States [would] furnish to [Westlands] and [Westlands] each . . . year [would] accept and pay . . . for water from the

See Pl.'s Resp. 16 (mentioning "an array of interim renewal contracts in 2012" and stating that these contracts "incorporated the terms of the 'Existing Interim Renewal Contract'" and did not purport "to abrogate the obligation to provide drainage"); id. at 1 n.1 (listing the 2012 interim contracts as contracts involved in the litigation); see also App. in Supp. of Corrected Resp. to Mot. to Dismiss (plaintiff's Appendix or Pl.'s App.), Dkt. Nos. 29-1 to 29-7, at 9-39 (2012 interim renewal contracts).  Plaintiff made no mention of the 2012 interim contracts in its Complaint, see Compl., Dkt. No. 1, ¶¶ 41-47 (discussing interim renewal contracts for 2007 and 2010 only), and plaintiff's attempt to extend its claims beyond the scope of its Complaint is improper, see Rules of the United States Court of Federal Claims (RCFC) 15(a) (governing amendments to the pleadings and stating that, when (as here) an amendment is not allowed as a matter of course, "a party may amend its pleading only with the opposing party's written consent or the court's leave"); see also Def.'s Reply in Supp. of Our Mot. to Dismiss (Def.'s Reply), Dkt. No. 32, at 13 n.9 (stating that plaintiff's attempt to expand the scope of the pleadings is improper).  If plaintiff seeks to include the 2012 interim renewal contracts in its Complaint, it must amend its Complaint pursuant to Rule 15 of the RCFC.  Cf. RCFC 15(a).  Because plaintiff has not done so, the court does not consider whether defendant has breached any obligations arising out of the 2012 interim renewals contracts.  Nonetheless, as defendant notes, see Def.'s Reply 13 n.9, because the 2012 interim renewal contracts incorporate the terms of the previous interim renewal contracts, see Pl.'s Resp. 16, the analysis with respect to such a claim would likely be the same as for the interim renewal contracts for 2007 and 2010, see infra Parts III.A.1.a.iii-iv (analyzing 2007 and 2010 interim renewal contracts).

[4] The Contract Between the United States and Westlands Water District Providing for Water Service (1963 Contract) is also reprinted in plaintiff's Appendix as Exhibit A to the Judgment in Barcellos & Wolfsen, Inc. v. Westlands Water District, Nos. CV 79-106-EDP & CV F-81-245-EDP (E.D. Cal. Dec. 30, 1986) (Barcellos Judgment).  See Pl.'s App. 223-65 (1963 Contract).

6

San Luis Unit." Def.'s App. A9 (1963 Contract). In the contract, the Secretary set a rate of payment for operation, maintenance and other fixed charges not to exceed eight dollars per acre-foot[5] of water, including a drainage service component not to exceed fifty cents per acre-foot of water. Id. at A15. Further, the 1963 Contract obligated Westlands to "construct such drainage works as are necessary to protect the irrigability of lands within [Westlands water district]." Id. at A25. These local drainage facilities of Westlands were permitted to "be connected to the interceptor drain in such capacity and at such locations as may be mutually agreed upon between [Westlands] and the United States." Id. at A12.

The 1963 Contract was effective from 1967, when Westlands began receiving water from the San Luis unit, until December 31, 2007. Compl. ¶¶ 20, 33; Def.'s Mot. 5; see Def.'s App. A7-8 (1963 Contract) (defining "initial delivery date" and stating that the contract was to "remain in effect for a period of forty (40) years commencing with the year in which the earliest initial delivery date of the long-term contracts for water service from the San Luis Unit shall occur").

2.      1965 Repayment Contract

As required by federal reclamation laws, the parties entered into a repayment contract, see Def.'s App. A127-70 (Contract Between the United States and Westlands Water District Providing for the Construction of a Water Distribution and Drainage Collector System (1965 Repayment Contract)),[6] for "the construction of a water distribution and drainage collector system," id. at A127, A129 (capitalization omitted); see Compl. ¶¶ 29, 37; Def.'s Mot. 6. As a repayment contract, the 1965 Repayment Contract is governed by 43 U.S.C. § 485h(d), where section 9(d) of the 1939 Act has been codified. See Def.'s Mot. 6. A separate repayment contract was necessary--in addition to a water service contract, which covered costs of operation and maintenance-- because under the 1939 Act, "the costs of any irrigation water distribution works constructed by the United States in connection with [a] new project [covered by a water service contract]" were to be covered by a separate repayment contract. 1939 Act § 9(e),

_____

[5]An acre-foot is "[a] volume measurement in irrigation, equal to the amount of water that will cover one acre of land in one foot of water (325,850 gallons)." Black's Law Dictionary (9th ed. 2009); Def.'s Mot. 4 n.3.

[6] The Contract Between the United States and Westlands Water District Providing for the Construction of a Water Distribution and Drainage Collector System (1965 Repayment Contract) is also reprinted in plaintiff's Appendix as Exhibit B to the Barcellos Judgment. See Pl.'s App. 279-316 (1965 Repayment Contract). The maps that have been omitted from Exhibit B to the Barcellos Judgment, see id. at 316, appear in defendant's version of the 1965 Repayment Contract, see App. to Def.'s Mot. to Dismiss (Def.'s App.), Dkt. Nos. 12-1,-2, at A163-70 (1965 Repayment Contract).

7

53 Stat. at 1196 (codified as amended at 43 U.S.C. § 485h(e)). Accordingly, the 1965 Repayment Contract provided for repayment by Westlands of the actual construction costs of the San Luis unit, see Def.'s App. A134 (1965 Repayment Contract), whereas the 1963 Contract provided for annual payment of estimated operation and maintenance costs and other fixed charges, see supra Part. I.B.1.

Specifically, the 1965 Repayment Contract provided that "[t]o the extent that funds [were then] or [t]hereafter [would] be available . . . , the United States [would] expend toward construction of a distribution system" up to $157,048,000. Def.'s App. A131 (1965 Repayment Contract). Westlands, in turn, agreed to "repay to the United States the actual cost of the distribution system constructed and acquired pursuant to [the 1965 Repayment Contract]," up to $157,048,000. Id. at A134-35. "The actual construction cost of the distribution system to be repaid to the United States by [Westlands] . . . embrace[d] all expenditures by the United States," which included "the cost of labor, material, equipment, engineering and legal work, superindence, administration and overhead, rights-of-way, property, . . . damage of all kinds, and . . . all sums expended by the Bureau of Reclamation in surveys and investigations in connection with the distribution system." Id. at A146. The contracting officer's "determination of what costs [were] properly chargeable" under the contract, and in what amounts, was to be conclusive. Id. The government and Westlands were required to "exert their best efforts to expedite the completion" of the distribution system. Id. at A132.

The 1965 Repayment Contract provided that the distribution system facilities would be constructed in three construction phases. Id. at A132-33; see Compl. ¶ 39. As required by federal reclamation law, see 1939 Act § 9(d)(3)-(4), 53 Stat. at 1195-96 (codified as amended at 43 U.S.C. § 485h(d)(3)-(4)), the actual construction costs for each phase would be paid by Westlands over a forty-year period, interest-free, beginning in the year following completion of the phase, see Def.'s App. A135 (1965 Repayment Contract); Compl. ¶ 37; Def.'s Mot. 6. Westlands began making payments pursuant to the 1965 Repayment Contract in or about 1979, Compl. ¶ 40; see id. ¶ 53, when the first phase of the subsurface drainage system connecting Westlands to the interceptor drain was completed, see id. ¶ 52. The other phases of construction were not completed after the government determined in or about 1978--incorrectly, according to plaintiff--that funds were insufficient. Id. ¶¶ 54-55. The 1965 Repayment Contract remains in force. See Def.'s App. A135-36 (1965 Repayment Contract) (describing forty-year term for payments); Pl.'s Resp. 14 ("The 1965 [Repayment] Contract does not expire until forty years after Westlands began making payments in 1979.").

3.      2007 Interim Water Service Contract

8

In 2007, the parties signed an interim water service renewal contract.[7] Compl. ¶¶ 29, 41; Def.'s Mot. 6; see Def.'s App. A44-120 (Interim Renewal Contract Between the United States and Westlands Water District Providing for Project Water Service San Luis Unit and Delta Division (2007 Interim Contract)). The 2007 Interim Contract provided that "the Contracting Officer [would] make available for delivery to [Westlands] 1,150,000 acre-feet of [Central Valley] Project Water for irrigation and [municipal and industrial] purposes" during each year of the 2007 Interim Contract. Def.'s App. A58 (2007 Interim Contract). Water delivered pursuant to the 2007 Interim Contract was to be paid for in accordance with the Secretary of the Interior's 1988 ratesetting policy for irrigation water and then-existing ratesetting policy for municipal and industrial water. Id. at A69; see id. at A112 (2007 Interim Contract Ex. B (2007 rates and charges)).

With respect to drainage, the 2007 Interim Contract provided that "[t]he Contracting Officer [would] notify [Westlands] in writing when drainage service [became] available," and that "the Contracting Officer [would thereafter] provide drainage service to [Westlands] at rates established pursuant to the then-existing ratesetting policy for Irrigation Water." Id. at A82 (2007 Interim Contract); see id. at A112 (2007 Interim Contract Ex. B (2007 rates and charges)).

The 2007 Interim Contract was effective from January 1, 2008 to February 28, 2010. Id. at A56 (2007 Interim Contract ); Compl. ¶ 41; Def.'s Mot. 6.

### 4. 2010 Interim Water Service Contract

In 2010, the parties signed a second interim water service renewal contract. Compl. ¶ 45; Def.'s Mot. 6; see Def.'s App. A121-26 (Interim Renewal Contract Between the United States and Westlands Water District Providing for Project Water Service (2010 Interim Contract)). The 2010 Interim Contract incorporated the terms and conditions of the 2007 Interim Contract. See Def.'s App. A122 (2010 Interim Contract); Compl. ¶ 46; Def.'s Mot. 6. It was effective from March 1, 2010 through February 29, 2012 and contained provisions for renewal if "a long-term renewal contract has not been executed with an effective commencement date of March 1, 2012." Def.'s App. A123 2010 Interim Contract).

## II. Legal Standards

---

[7] Although the 1963 Contract contemplated a long-term extension, see Def.'s App. A8 (1963 Contract), no long-term extension was entered into because certain environmental requirements imposed by the Central Valley Project Improvement Act, Pub. L. No. 102-575, § 3404(c)(1), 106 Stat. 4600, 4708-09 (1992), were not met, see Compl. ¶¶ 41, 45; Def.'s Mot. 6 n.4.

A.     Jurisdiction

Subject matter jurisdiction is a threshold matter that a court must determine at the outset of a case.  See Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 94-95 (1998); PODS, Inc. v. Porta Stor, Inc., 484 F.3d 1359, 1365 (Fed. Cir. 2007).  Pursuant to the Tucker Act, the United States Court of Federal Claims (Court of Federal Claims) has jurisdiction over "any claim against the United States founded . . . upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States."  28 U.S.C. § 1491(a)(1) (2006).  The Tucker Act serves as a waiver of sovereign immunity and a jurisdictional grant, but it does not create a substantive cause of action.  Jan's Helicopter Serv., Inc. v. Fed. Aviation Admin., 525 F.3d 1299, 1306 (Fed. Cir. 2008).  A plaintiff must, therefore, "'identify a separate source of substantive law that creates the right to money damages.'"  Id. (quoting Fisher v. United States, 402 F.3d 1167, 1172 (Fed. Cir. 2005) (en banc in relevant part)).

The court's six-year statute of limitations, a condition on the Tucker Act's waiver of sovereign immunity, further limits the court's jurisdiction.  See Martinez v. United States, 333 F.3d 1295, 1316 (Fed. Cir. 2003) (en banc) ("It is well established that statutes of limitations for causes of action against the United States, being conditions on the waiver of sovereign immunity, are jurisdictional in nature."); see also Soriano v. United States, 352 U.S. 270, 276 (1957) (stating that the United States Supreme Court "has long decided that limitations and conditions upon which the Government consents to be sued must be strictly observed").  Because the statute of limitations in this court is jurisdictional, Martinez, 333 F.3d at 1316, it cannot be waived, see John R. Sand & Gravel Co. v. United States, 552 U.S. 130, 134-35 (2008) (noting the "absolute nature" of "jurisdictional" limitations statute for this court).

The statute of limitations provides that claims over which the Court of Federal Claims would otherwise have jurisdiction "shall be barred unless the petition thereon is filed within six years after such claim first accrues."  28 U.S.C. § 2501 (2006).  A breach of contract claim first accrues when a plaintiff has fully performed its obligations under the contract--entitling the plaintiff to performance by the defendant--but the defendant has failed to perform.  See Oceanic Steamship Co. v. United States, 165 Ct. Cl. 217, 225 (1964) (per curiam) (reprinting opinion and recommendation of trial commissioner, adopted as supplemented) ("[W]here a claim is based upon a contractual obligation of the Government to pay money, the claim first accrues on the date when the payment becomes due and is wrongfully withheld in breach of the contract."); accord Kinsey v. United States, 852 F.2d 556, 557 (Fed. Cir. 1988); see also Brighton Vill. Assocs. v. United States, 52 F.3d 1056, 1060 (Fed. Cir. 1995) (stating that "[a] claim accrues when all the events have occurred which fix the liability of the Government and entitle the claimant to institute an action" (internal quotation marks omitted)).  However, the continuing claim doctrine "permits separate causes of action to accrue each time a plaintiff suffers damage

10

which is the 'result of [a] new and independent breach[] by the government.'" Banks v. United States, 88 Fed. Cl. 665, 679 (2009) (alterations in original) (quoting Boling v. United States, 220 F.3d 1365, 1374 (Fed. Cir. 2000)).

In considering a motion to dismiss for lack of subject matter jurisdiction pursuant to Rule 12(b)(1) of the RCFC, as with a motion to dismiss pursuant to Rule 12(b)(6), the court must accept as true all undisputed allegations of fact made by the non-moving party and draw all reasonable inferences from those facts in the non-moving party's favor. See Trusted Integration, Inc. v. United States, 659 F.3d 1159, 1163 (Fed. Cir. 2011) (citing Henke v. United States, 60 F.3d 795, 797 (Fed. Cir. 1995)). However, "[w]hen a party challenges the jurisdictional facts alleged in the complaint, the court may consider relevant evidence outside the pleadings to resolve the factual dispute." Arakaki v. United States, 62 Fed. Cl. 244, 247 (2004) (citing Reynolds v. Army & Air Force Exch. Serv., 846 F.2d 746, 747 (Fed. Cir. 1988) & Indium Corp. of Am. v. Semi-Alloys, Inc., 781 F.2d 879, 884 (Fed. Cir. 1985)). If the court determines that it does not have jurisdiction, it must dismiss the claim. See RCFC 12(h)(3). The burden is on the plaintiff to show jurisdiction by a preponderance of the evidence. Taylor v. United States, 303 F.3d 1357, 1359 (Fed. Cir. 2002).

B.      Failure to State a Claim

A motion to dismiss pursuant to RCFC 12(b)(6)[8] asserts a "failure to state a claim upon which relief can be granted." RCFC 12(b)(6). To survive a Rule 12(b)(6) motion, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal (Iqbal), 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly (Twombly), 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. (citing Twombly, 550 U.S. at 556). This means that the complaint must "raise a right of relief above the speculative level." See Twombly, 550 U.S. at 555.

When ruling on a Rule 12(b)(6) motion to dismiss, the court "must accept as true all the factual allegations in the complaint." Sommers Oil Co. v. United States (Sommers Oil), 241 F.3d 1375, 1378 (Fed.Cir. 2001). Further, "in addition to the complaint . . . and exhibits thereto, the court 'must consider . . . documents incorporated into the complaint

---

[8] The RCFC generally mirror the Federal Rules of Civil Procedure (FRCP). See C. Sanchez & Son, Inc. v. United States, 6 F.3d 1539, 1541 n.2 (Fed. Cir. 1993) (stating that "[t]he [RCFC] . . . generally follow the [FRCP]"); RCFC 2002 Rules Committee Note ("[I]nterpretation of the court's rules will be guided by case law and the Advisory Committee Notes that accompany the Federal Rules of Civil Procedure."). Rule 12 of the RCFC is substantially identical to Rule 12 of the FRCP. Compare RCFC 12, with FRCP 12. Therefore, the court relies on cases interpreting FRCP 12 as well as those interpreting RCFC 12.

11

by reference, and matters of which a court may take judicial notice.'" Bell/Heery v. United States, 106 Fed. Cl. 300, 307 (2012) (second alteration in original) (quoting Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 322 (2007)). Based on this information, the court must make "all reasonable inferences in favor of the non-movant." Sommers Oil, 241 F.3d at 1378. Nonetheless, "threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Iqbal, 556 U.S. at 678. Further, the court is "not bound to accept as true a legal conclusion couched as a factual allegation." Papasan v. Allain, 478 U.S. 265, 286 (1986); see Twombly, 550 U.S. at 555.

C.     Interpretation of Contract Terms

Contracts to which the government is a party are subject to general rules of contract interpretation. Lockheed Martin IR Imaging Sys., Inc. v. West, 108 F.3d 319, 322 (Fed. Cir. 1997). Pursuant to these rules, "[c]ontract interpretation begins with the language of the written agreement." Coast Fed. Bank, FSB v. United States, 323 F.3d 1035, 1038 (Fed. Cir. 2003) (citing Foley Co. v. United States, 11 F.3d 1032, 1034 (Fed. Cir. 1993)). Contract provisions that are "clear and unambiguous . . . must be given their plain and ordinary meaning." McAbee Constr., Inc. v. United States (McAbee), 97 F.3d 1431, 1435 (Fed. Cir. 1996) (internal quotation marks omitted); accord Barsebäck Kraft AB v. United States, 121 F.3d 1475, 1479 (Fed. Cir. 1997). "A contract is unambiguous when it is reasonably open to only one interpretation." Pacificorp Capital, Inc. v. United States (Pacificorp), 25 Cl. Ct. 707, 716 (1992), aff'd, 988 F.2d 130 (Fed. Cir. 1993) (unpublished table decision).

Only when a contract contains vague and ambiguous language may the court look to factors outside the contractual terms--including explanatory recitals to the contract (also called "whereas clauses"), oral statements, writings, prior negotiations and other conduct by which the parties manifested assent--to determine the parties' intent. KMS Fusion, Inc. v. United States (KMS Fusion), 36 Fed. Cl. 68, 77 (1996), aff'd 108 F.3d 1393 (Fed. Cir. 1997) (unpublished table decision). Contract language is ambiguous if it is "susceptible to more than one reasonable interpretation." McAbee, 97 F.3d at 1434-35. "It is not enough that the parties differ in their interpretation of the contract clause." Dart Advantage Warehous., Inc. v. United States, 52 Fed. Cl. 694, 700 (2002) (citing Cmty. Heating & Plumbing Co. v. Kelso, 987 F.2d 1575, 1578 (Fed. Cir. 1993)). Instead, to be ambiguous, a contract must "sustain[] the interpretations advanced by both parties to the suit." Pacificorp, 25 Cl. Ct. at 716.

Of particular relevance to this case, the canons of interpretation of government contracts provide that a government representation does not constitute a binding contractual obligation unless it is "'stated in the form of an undertaking, not as a mere prediction or statement of opinion or intention.'" Chattler v. United States, 632 F.3d

12

1324, 1330 (Fed. Cir. 2011) (quoting Cutler-Hammer, Inc. v. United States, 194 Ct. Cl. 788, 794, 441 F.2d 1179, 1182 (1971)); Nat'l By-Prods., Inc. v. United States, 186 Ct. Cl. 546, 560, 405 F.2d 1256, 1264 (1969). Moreover, statutory provisions generally will not be "incorporated into a contract with the government unless the contract explicitly provides for their incorporation." St. Christopher Assocs., L.P. v. United States (St. Christopher), 511 F.3d 1376, 1384 (Fed. Cir. 2008); see Smithson v. United States, 847 F.2d 791, 794 (Fed. Cir. 1988) (finding that a contract "subject" to present and future regulations did not incorporate such regulations into the contract and stating that "only the plainest language" could impose such a contractual liability on the government (internal quotation marks omitted)).

### D. Issue Preclusion

The doctrine of issue preclusion prevents a party from relitigating an issue when that party has litigated the same issue on the merits and lost. Masco Corp. v. United States, 303 F.3d 1316, 1329 (Fed. Cir. 2002); In re Freeman (Freeman), 30 F.3d 1459, 1465 (Fed. Cir. 1994). Issue preclusion requires that: (1) the issue be identical to the issue in the first action; (2) the issue was actually litigated in the first action; (3) resolution of the issue was essential to a final judgment in the first action; and (4) the party precluded had a full and fair opportunity to litigate the issue in the first action. Freeman, 30 F.3d at 1465; accord Masco Corp., 303 F.3d at 1329.

### E. Declaratory Judgment

As a court of limited jurisdiction, the Court of Federal Claims cannot issue declaratory judgments without express statutory authorization. See United States v. Testan, 424 U.S. 392, 398 (1976) (characterizing the holding in United States v. King, 395 U.S. 1 (1969), as a holding that "the Declaratory Judgment Act did not grant the [United States] Court of Claims [(Court of Claims[9])] authority to issue declaratory judgments"); King, 395 U.S. at 5 (holding that the Court of Claims has no general authority to issue declaratory judgments); Suess v. United States, 33 Fed. Cl. 89, 92 (1995) ("[A]bsent statutory authorization, this court cannot grant equitable relief."). The court has statutory authorization to provide broad declaratory relief in certain categories of cases, including in the context of bid protests, for example. See 28 U.S.C. § 1491(b)(2); see also Halim v. United States, No. 12-5 C, 2012 WL 4356211, at *7 (Fed. Cl. Sept. 24, 2012) (describing statutory authorizations of the Court of Federal Claims to provide equitable relief in certain types of tax cases, disputes under the Contracts

---

[9] The United States Court of Claims (Court of Claims) is the predecessor court to this court and a predecessor to the United States Court of Appeals for the Federal Circuit. When acting in its appellate capacity, the Court of Claims created precedent that is binding on this court. South Corp. v. United States, 690 F.2d 1368, 1369 (Fed. Cir. 1982) (en banc).

13

Disputes Act of 1978 and pursuant to its bid protest jurisdiction). The court is also statutorily authorized to "issue orders [to any appropriate United States official] directing restoration to office or position, placement in appropriate duty or retirement status, and correction of applicable records," when such relief is "an incident of and collateral to" a money judgment. 28 U.S.C. § 1491(a)(2); see James v. Caldera, 159 F.3d 573, 580 (Fed. Cir. 1998) (interpreting "incident of and collateral to" to mean that non-monetary relief must be "tied and subordinate to a money judgment") (internal quotations omitted). However, the court lacks general authority to grant declaratory judgment in breach of contract cases that are outside these statutorily defined categories. See King, 395 U.S. at 5.

These limits on the court's authority to provide declaratory relief do not bar the court from making a ruling of law when such a ruling is "necessary to the resolution of a claim for money presently due and owing." Hydrothermal Energy Corp. v. United States (Hydrothermal), 26 Cl. Ct. 7, 16 (1992); see Pauley Petroleum, Inc. v. United States, 219 Ct. Cl. 24, 38, 591 F.2d 1308, 1315 (1979) (en banc) ("[M]erely because the court must make a ruling of law . . . in order to arrive at a money judgment does not render [the] court's decision a 'declaratory judgment' . . . .").

III.    Discussion

Generally, the court considers whether jurisdictional requirements are met before turning to the merits of a plaintiff's claims. PODS, Inc. v. Porta Stor, Inc., 484 F.3d 1359, 1365 (Fed. Cir. 2007); see Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 94-95 (1998) (stating the subject matter jurisdiction is a threshold matter). Here, because plaintiff's arguments are so protean, it is difficult to discern whether plaintiff is discussing the nature of a claim or how the claim accrued. In particular, jurisdictional analysis with respect to the statute of limitations is hindered by plaintiff's variable assertions. For example, plaintiff asserts--on the same page of its Response--both that defendant has "continuously breached" its purported drainage obligation "since at least 1986 by providing no drainage facilities or service at all" and that "no cause of action accrued until the Government made clear its intent to abandon its drainage obligation in September of 2010." Pl.'s Resp. 28 (internal quotation marks omitted); cf. id. at 40 ("Since the duty of immediate performance never arose, there was no breach."). Because of the difficulty in applying jurisdictional standards to irreconcilable assertions and because the substance of plaintiff's claims is intertwined with plaintiff's accrual theories, the court first considers whether--if plaintiff's Complaint were timely and otherwise within the court's jurisdiction--any of plaintiff's assertions would constitute a claim upon which relief can be granted.

A.      Plaintiff Has Failed to State a Claim upon Which Relief Can Be Granted with Respect to Claims One Through Six

14

### 1. Claims One and Two:  Breach of Contract

"To recover against the government for an alleged breach of contract, there must be, in the first place, a binding agreement."  Anderson v. United States, 344 F.3d 1343, 1353 (Fed. Cir. 2003).  Four requirements must be met for an agreement to bind the government:  "(1) mutuality of intent to contract; (2) lack of ambiguity in offer and acceptance; (3) consideration; and (4) a government representative having actual authority to bind the United States in contract."  Id.  These requirements are the same whether the contract is express or implied.  Trauma Serv. Grp. v. United States, 104 F.3d 1321, 1325 (Fed. Cir. 1997).  Generally, statutory provisions will not be "incorporated into a contract with the government unless the contract explicitly provides for their incorporation."  St. Christopher, 511 F.3d at 1384.

A contract is breached when a party fails to "perform a contractual duty when it is due."  Winstar Corp. v. United States, 64 F.3d 1531, 1545 (Fed. Cir. 1995) (citing Restatement (Second) of Contracts § 235(2) (1981)), aff'd, 518 U.S. 839 (1996).  "Non-performance includes defective performance as well as an absence of performance."  Restatement (Second) of Contracts § 235 cmt. b.

Therefore, to survive defendant's Motion with respect to its breach of contract claims, plaintiff must have pleaded facts sufficient to allow the court to draw a reasonable inference, see Iqbal, 556 U.S. at 678, that defendant had an express or implied contractual duty to provide drainage and that defendant did not adequately perform such contractual duty when it was due, see Winstar Corp., 64 F.3d at 1545; Restatement (Second) of Contracts § 235(2) & cmt. b.

#### a. Past Breaches of Express Contractual Obligation

Defendant argues that "Westlands has failed to state a claim upon which relief can be granted because its complaint lacks sufficient factual allegations to establish, beyond a speculative level, the existence of a drainage obligation arising out of any of the contracts at issue."  Def.'s Mot. at 14.  Plaintiff responds that "beginning with the 1963 Contract, all contracts between Westlands and the Government expressly obligated the government to provide drainage."  Pl.'s Resp. 9 (capitalization and emphasis omitted); see Compl. ¶ 5 ("Westlands included in all its contracts with the Government contractual obligations to build drainage facilities that incorporated the Government's statutory obligation.").  However, plaintiff concedes that "[t]he Contracts . . . set no definite time for the government to provide drainage services, to construct a drainage system or even to construct discrete increments of a drainage system.  Nor did they even set forth a construction schedule."  Pl.'s Resp. 10.  The court considers each of the contracts below.

##### i. 1963 Contract

15

a)     Issue Preclusion

Plaintiff contends that "defendant is issue precluded from litigating whether the 1963 Contract obligates the government to provide drainage." Pl.'s Resp. 5 (capitalization and emphasis omitted). Plaintiff asserts that in prior litigation involving Westlands, "the court squarely held that the 1963 Contract required the Government to provide drainage." Id. Defendant responds that "[t]he sufficiency of Westlands'[] pleadings in this case has, of course, not been previously litigated or decided," Def.'s Reply 12, and that the issue in the previous litigation was not identical to the issue here, making issue preclusion inapplicable, id. at 12-13. Defendant also asserts that plaintiff's argument "overstates the holding of the decision in question." Id. at 12.

Under the doctrine of issue preclusion, a party that has litigated an issue on the merits and lost is precluded from relitigating that issue if four requirements are met: (1) the issue in the first action was identical to the issue before the court; (2) in the first action, the issue was actually litigated; (3) in the first action, the final judgment depended on the resolution of the issue; and (4) in the first action, the plaintiff had a full and fair opportunity to litigate the issue. Freeman, 30 F.3d at 1465; accord Masco Corp., 303 F.3d at 1329. Here, plaintiff's issue preclusion argument fails, both because the issue in the previous litigation was not identical to the issue here and because plaintiff misstates the court's ruling in the previous litigation.

The earlier case, United States v. Westlands Water District (Westlands I), was brought by the United States against Westlands after Westlands refused to pay full price-- as required by federal reclamation law enacted in 1987--for federal water delivered to so-called excess lands. Westlands I, 134 F. Supp. 2d 1111, 1114-15 (E.D. Cal. 2001). The excess lands were lands exceeding a certain acreage within the Westlands water district, see Def.'s App. A34 (1963 Contract) (defining "excess land"), and the owners of the excess lands could receive water from Westlands only after executing contracts, referred to as "recordable contracts," in which the owners agreed to sell their excess land within ten years under certain terms, id. at A35; see Omnibus Adjustment Act of 1926, Pub. L. No. 69-284, § 46, 44 Stat. 636, 649 (codified as amended at 43 U.S.C. § 423e (2006)) (mandating sale of excess lands). Pursuant to the recordable contracts, the owners paid Westlands for water at a rate of eight dollars per acre-foot, a rate equal to the rate set forth in the 1963 Contract. See Westlands I, 134 F. Supp. 2d at 1115, 1138-39. Westlands collected these water charges and remitted payment to the United States for water service, pursuant to the 1963 Contract. See id. at 1115. The recordable contracts also contained a provision for the tolling of the ten-year period for selling excess lands (the tolling period) if "'water or service from the [Central Valley] Project [was] not . . . available to the land involved through no fault of [Westlands] or the Landowner.'" Id. at 1117 (quoting the recordable contracts).

16

The Westlands I court held that the landowners within Westlands water district were entitled to summary judgment that they had an enforceable right under the 1963 Contract, their recordable contracts and the Barcellos Judgment[10] to pay not the full price of water delivery as required by federal reclamation law but the eight dollar per acre-foot rate "for excess lands during any lawful [tolling period] caused by the government's failure, if any, to provide drainage." Westlands I, 134 F. Supp. 2d at 1158. The Westlands I court stated that the issue in the case before it was "the effect of an absence of drainage service on the full-cost provision and the [tolling] period." Id. at 1134. In evaluating that issue, the court stated that the term "service" in the portion of the recordable contracts related to the tolling period encompassed drainage service. Id.; see also id. at 1139-40 (discussing relevant provisions of the recordable contracts, which provided for tolling for any period in which "water or service" was not available). The court did not discuss or recognize any contractual drainage service obligation of the government to Westlands arising out of the 1963 Contract. See id. at 1138-39, 1142-43 (discussing provisions of the 1963 Contract). Instead, the Westlands I court stated that "[t]he 1963 Contract and the 1986 Barcellos Judgment [gave] a protectable contractual right to $8.00/acre-foot water for the water users' excess lands during any [tolling] periods caused by the government's failure, if any, to provide drainage service." Id. at

---

[10] In 1979, after the government challenged the validity of rates set by the 1963 Contract as a result of changes to federal reclamation laws, a group of landowners within the Westlands water district filed a class action suit to determine water priorities, with respect to both amount and price of water, against other landowners in the district, Westlands and the government. Barcellos & Wolfsen, Inc. v. Westlands Water Dist. (Barcellos), 491 F. Supp. 263, 264-65 (E.D. Cal. 1980); see Compl. ¶ 71. Westlands, named as a defendant in the suit, filed cross claims and counterclaims, "seeking a determination of the respective rights and duties of the parties under the [1963 Contract] and Federal Reclamation Law." Barcellos, 491 F. Supp. at 265. Westlands also filed another suit seeking similar relief, Westlands Water Dist. v. United States, No. CV F-81-245-EDP (E.D. Cal.), which was consolidated into Barcellos. Compl. ¶ 71; see Pl.'s App. 168 (Barcellos Judgment) (showing consolidation of No. CV F-81-245-EDP).

The consolidated cases ultimately settled, and judgment was entered pursuant to the parties' agreement. Compl. ¶ 73; see Pl.'s App. 167-222 (Barcellos Judgment). Notably, the Barcellos Judgment upheld the validity of the 1963 Contract. Compl. ¶ 73; see Pl.'s App. 177-80 (Barcellos Judgment). With respect to drainage, it required the government to "adopt and submit to [Westlands] by December 1, 1991, a Drainage Plan for Drainage Service Facilities," Pl.'s App. 186 (Barcellos Judgment); Compl. ¶ 74, and stated that the government would "make a good faith effort to construct water distribution and collector drainage facilities needed in the [Westlands Water] District in addition to those constructed under the 1965 [Repayment] Contract," Pl.'s App. 206 (Barcellos Judgment). However, the Barcellos Judgment was clear that "[n]othing in this Judgment . . . shall be deemed to create any obligation of the United States to provide any drainage service to [Westlands] or to construct Drainage Service Facilities." Id. at 222; see also id. at 173-74 (defining "Drainage Service Facility" broadly, to include the originally planned interceptor drain as well as any partial or full alternative to it).

17

1143. Because the issue in Westlands I--whether the eight-dollar per acre-foot rate or full cost provision applied for excess land owners during a tolling period, see id. at 1134,--is not identical to the issue raised in this case--whether the 1963 Contract obligated the government to provide drainage to Westlands, see Pl.'s Resp. 5 (characterizing "the issue presented here" as "whether the 1963 Contract obligated the Government to provide drainage"),--issue preclusion is inapplicable, see Masco Corp., 303 F.3d at 1329; Freeman, 30 F.3d at 1465.

Issue preclusion is also inappropriate because plaintiff's issue preclusion argument is based on a mischaracterization of Westlands I. Plaintiff states that the Westlands I court saw the issue of "whether the [ten-year] period was tolled during periods when no drainage service was being provided" as dependent upon "whether the 1963 Contract obligated the Government to provide drainage." Pl.'s Resp. 6. As discussed above, this is simply not true: the Westlands I court addressed the price of water for excess land owners, not a purported obligation under the 1963 Contract to provide drainage. See Westlands I, 134 F. Supp. 2d at 1134. Nonetheless, plaintiff contends that "the Court's conclusion that 'the parties agreed in the 1963 Contract to ten years of subsidized water and drainage service' precludes the government from arguing now that the 1963 Contract does not require the Government to provide drainage." Pl.'s Resp. 6 (emphasis omitted) (quoting Westlands I, 134 F. Supp. 2d at 1143 n.72). Plaintiff takes the Westlands I court's language completely out of context. The text of the footnote cited by plaintiff in support of its argument reads, in relevant part:

> [T]he parties agreed in the 1963 Contract to ten years of subsidized water and drainage service for excess lands under recordable contract. However, if drainage service has not been provided, . . . then those ten years of "water and service" for the excess lands have not yet been provided . . . . In that case, [the portion of the recordable contracts related to the tolling period] extends the ownership and contract-priced water for the excess lands until 10 years of water and drainage service have been provided.

Westlands I, 134 F. Supp. 2d 1143 n.72 (first emphasis added). In other words, the footnote acknowledges that the portions of the 1963 Contract addressing excess lands created a scheme under which the excess lands would receive subsidized water and drainage service--meaning water and drainage service at the eight dollar per acre-foot rate--during the ten-year period for selling the excess lands. See id. However, if the ten-year period was tolled until drainage service was provided, pursuant to the recordable contracts, then the eight dollar rate--as opposed to the full cost of water delivery--would continue to apply. Id. This footnote, contrary to plaintiff's assertion, see Pl.'s Resp. 6, does not acknowledge any governmental obligation to provide drainage to Westlands arising out of the 1963 Contract; nor do the footnote and surrounding text cited by

18

plaintiff amount to a holding that Westlands has a contractual right to drainage under the 1963 Contract. Issue preclusion is therefore inappropriate.

b) Contract Terms

Plaintiff also contends that the 1963 Contract expressly obligated defendant "to sell water to Westlands and provide the drainage services and facilities necessary to drain the land to which that water was applied." Compl. ¶ 30. Plaintiff further contends that it agreed to build local drainage facilities to carry water to the interceptor drain "[i]n reliance o[n] the Government's commitment to build the Interceptor Drain." Pl.'s Resp. 11 (citing Def.'s App. A25 (1963 Contract) (authorizing connection of local drainage facilities to the interceptor drain)). Defendant replies that plaintiff has "fail[ed] to identify any provision of the 1963 Contract that obligated the government to provide drainage," Def.'s Mot. 15, and that the contract provisions cited by plaintiff in support of its argument refer only "to the parties' recognition that Interior intended to provide an interceptor drain as set forth in the San Luis Act," id. at 19-20.

The court now examines the provisions of the 1963 Contract cited by plaintiff as purported sources of a contractual drainage obligation. For the following reasons, the court concludes that none of these provisions creates such an obligation.

First, plaintiff cites the rate provision. See Pl.'s Resp. 11. The contract's rate provision includes a fifty-cent per acre-foot drainage service component. See Def.'s App. A15 (1963 Contract). Westlands argues that its position that this creates a contractual drainage obligation is strengthened by the contract provision that the drainage service component become payable when--not if--interceptor drain service became available. Pl.'s Resp. 11; cf. Def.'s App. A15 (1963 Contract). Defendant points out that the rate provision specifies only the "statutorily-required rate, as well as when and how Westlands would make payment" but "does not contain any language[]by which the United States allegedly undertook a drainage obligation." Def.'s Mot. 19. Defendant is correct; there is no language in the rate provision creating an express drainage obligation.

Federal reclamation law makes clear that, at the time the 1963 Contract was entered into, water service contract rates reflected the Secretary's estimate of annual operation and maintenance costs, as well as other fixed costs. See 1939 Act § 9(e), 53 Stat. at 1196. That a drainage service component was included in the 1963 Contract rate reflects only the estimated annual costs of operating and maintaining the planned drainage facilities. Cf. Chattler, 632 F.3d at 1330 (stating that a government representation must be stated in the form of an undertaking, not as a prediction or opinion, to be binding); Nat'l By-Prods., Inc., 186 Ct. Cl. at 560, 405 F.2d at 1264 (same). Based on its plain meaning, the rate provision is not a binding governmental obligation to undertake to complete the interceptor drain but is, instead, a binding

payment term.  See McAbee, 97 F.3d at 1435 (stating that the plain language of an unambiguous contract provision controls).  Similarly, the contract provision stating that the drainage component rate was not payable until interceptor drain service was available did not constitute a binding government undertaking to provide drainage; it was instead a statement of the government's prediction or intent that drainage service would be available in the future--and a binding obligation with respect to payment terms if and when the contemplated drainage service became available.  Cf. Chattler, 632 F.3d at 1330; Nat'l By-Prods., Inc., 186 Ct. Cl. at 560, 405 F.2d at 1264.

Next, plaintiff asserts that "[f]urther confirmation of the Government's [drainage] obligation can be found in" the contract provision in which defendant "reserves the privilege to 'temporarily discontinue or reduce . . . the service of the interceptor drain.'" Pl.'s Resp. 12 (alteration in original).  Plaintiff contends that "[w]ere the Government not obligated to provide drainage service," this provision would be unnecessary.  Id. Defendant argues that, to the extent that any drainage obligation can be inferred from this provision, such an obligation must be statutory because the provision itself contains no language setting forth a binding government undertaking to provide drainage.  Def.'s Reply 10 (citing Chattler, 632 F.3d at 1330).

Defendant is again correct; there is no language in this provision creating an express drainage obligation.  The provision serves mainly as a notice provision with respect to the interceptor drain, providing that "so far as feasible the United States will give [Westlands] due notice in advance of such temporary discontinuance or reduction." See Def.'s App. A21 (1963 Contract).  Such a provision is entirely consistent with defendant's statutory duty to provide drainage, cf. San Luis Act § 5, 74 Stat. at 159 (discussing Secretary's authority to construct, operate and maintain a drainage system for the San Luis unit); Firebaugh Canal Co. v. United States (Firebaugh), 203 F.3d 568, 578 (9th Cir. 2000) (holding that the government had a statutory duty under the San Luis Act to provide drainage to Westlands), and does not constitute a separate contractual undertaking to provide drainage.  At most it represents defendant's prediction or intent that the interceptor drain will provide service to Westlands in the future.  Cf. Chattler, 632 F.3d at 1330; Nat'l By-Prods., Inc., 186 Ct. Cl. at 560, 405 F.2d at 1264.

Plaintiff also cites to several nonoperative portions of the 1963 Contract, including two explanatory recitals and a definitional term, in support of its position.  See Pl.'s Resp. 11.  The third and fifth explanatory recitals state, respectively, in relevant part:

> WHEREAS, the United States is providing an interceptor drain to meet the drainage requirements of the San Luis Unit of the Federal Central Valley Project; and
> . . . .

WHEREAS, [Westlands] desires to contract . . . for the furnishing by the United States of a supplemental water supply from the Project and for drainage service by means of the interceptor drain for which [Westlands] will make payment to the United States upon the basis, at the rate, and pursuant to the conditions hereinafter set forth[.]

Def.'s App. A5 (1963 Contract); see Pl.'s Resp. 11. The 1963 Contract defines "interceptor drain" as "the physical works constructed by the United States pursuant generally to the [San Luis Act] . . . in order to meet the drainage requirements of the area served by the San Luis Unit." Def.'s App. A6-7 (1963 Contract); see Pl.'s Resp. 11. Defendant contends that "[t]hese recitals and definition did not obligate the Government to provide drainage service," both because whereas clauses and definitions are not "operative portion[s] of the contract" and because "the language cited by Westlands does not amount to binding promises by the United States to provide drainage." Def.'s Mot. 16. Defendant further contends that, "to the extent the contract contemplated drainage, it stated drainage is a statutory obligation; it says nothing about a contractual duty." Id. at 17. Defendant is correct.

Courts do not interpret a government representation as a binding contractual obligation unless it is "stated in the form of an undertaking, not as a mere prediction or statement of opinion or intention." Chattler, 632 F.3d at 1330 (internal quotation marks omitted); Nat'l By-Prods., Inc., 186 Ct. Cl. at 560, 405 F.2d at 1264. Only where a contract contains vague and ambiguous language may the court look to factors outside the contractual terms, including to the explanatory recitals (or "whereas clauses"), to determine the parties' intent. KMS Fusion, 36 Fed. Cl. at 77. "'[W]hereas' clauses generally are not considered 'contractual' and cannot be permitted to control the express provisions of the contract . . . ."[11] Id.

Here, there is no basis for concluding from the explanatory recitals and definition that defendant was contractually obligated to provide drainage to plaintiff under the 1963 Contract. Plaintiff cites no operative contract provision that is susceptible to the interpretation that it created a drainage obligation because none of the provisions cited by plaintiff contains language creating a drainage obligation. Cf. McAbee, 97 F.3d at 1434-35 (stating that a contract is ambiguous if it is susceptible to more than one

_____

[11] Plaintiff cites Solar Turbines, Inc. v. United States (Solar Turbines), 23 Cl. Ct. 142, 149 n.2 (1991) as an example of a case where the court construed an explanatory recital or "whereas clause" as implying a promise by the government. Pl.'s Resp. 8. However, the finding of the court in Solar Turbines was that the promise contained in the whereas clause at issue in that case (stating that the government was willing to provide additional funding to the plaintiff)-- and its fulfillment--constituted consideration for the contract. See Solar Turbines, 23 Cl. Ct. at 149 n.2. The Solar Turbines court did not find that the whereas clause in that case was itself an enforceable contract provision.

interpretation). And even if the court were to look beyond the operative contract provisions to the explanatory recitals and definition for the parties' intent, cf. KMS Fusion, Inc., 36 Fed. Cl. at 77 (stating that a court may look outside the contractual terms, including to explanatory recitals, to determine the parties' intent only when the language of the contract is vague and ambiguous), it cannot conclude that the recitals and definition manifest an intent to create a contractual drainage obligation. At most, the third explanatory recital, see Def.'s App. A5 (1963 Contract), and the definition of "interceptor drain," see id. at A6-7, constitute a statement that defendant intended to fulfill its statutory duty to provide drainage pursuant to the San Luis Act, cf. St. Christopher, 511 F.3d at 1384 (stating that the United States Court of Appeals for the Federal Circuit (Federal Circuit) "has been reluctant to find that statutory . . . provisions are incorporated into a contract with the government unless the contract explicitly provides for their incorporation"). Similarly, the fifth explanatory recital, see Def.'s App. A5 (1963 Contract), establishes at most plaintiff's intent to contract for water supply and drainage service at the rates set out in the 1963 Contract. The recitals and definition do not create a binding contractual drainage obligation. Cf. Chattler, 632 F.3d at 1330; Nat'l By-Prods., Inc., 186 Ct. Cl. at 560, 405 F.2d at 1264.

For the foregoing reasons, with respect to the 1963 Contract, plaintiff has not pleaded sufficient facts to state a facially plausible claim for relief based on an express breach of contract theory. See Iqbal, 556 U.S. at 678; Twombly 550 U.S. at 570.

ii.    1965 Repayment Contract

Plaintiff alleges that "[t]he 1965 contract expressly, and independently, created an obligation of the government to provide drainage." Pl.'s Resp. 12 (capitalization and emphasis omitted). Defendant responds that plaintiff failed to allege a breach with respect to the 1965 Repayment Contract "because it acknowledges that segments of the project were constructed and that it has been repaying the construction costs incurred." Def.'s Reply 16. In other words, defendant argues that its contractual obligations, if any, to provide drainage pursuant to the 1965 Repayment Contract have been met. See id.

The 1965 Repayment Contract covered the costs of the actual construction of the San Luis unit, as required by federal reclamation law. See supra Part I.B.2. The substance of the bargain underlying the 1965 Repayment Contract is contained in two promises. First, defendant promised that, "[t]o the extent that funds [were then] or [t]hereafter [would] be available[,] . . . the United States [would] expend toward construction of a distribution system . . . a sum not in excess of" $157,048,000. Def.'s App. A131 (1965 Repayment Contract) (emphasis added). Notably, this provision conditioned construction of the contemplated distribution system for the San Luis unit, which included drainage, on the availability of funds. See id. (defining "distribution

22

system"). In return, plaintiff promised to "repay to the United States the actual cost of the distribution system constructed" up to $157,048,000. Id. at A134-35.

Under the terms of the 1965 Repayment Contract, the first phase of construction was to include "substantially all of the water distribution facilities, drainage collector facilities, and works for the integration of ground with surface water, . . . as initially required to serve [a certain portion of Westlands water district]." Id. at A132. Plaintiff began making payments pursuant to the 1965 Repayment Contract in or about 1979, Compl. ¶ 40; see id. ¶ 53, when the first phase of the subsurface drainage system connecting Westlands to the interceptor drain was completed, see id. ¶ 52. As defendant correctly notes, see Def.'s Reply 16, plaintiff does not allege that the completion of this portion of the construction, which resulted in drainage service to Westlands from 1979 to 1985, see Compl. ¶¶ 52, 58; Def.'s Mot. 7, failed to include "substantially all" of the facilities "initially required" to serve the portion of Westlands water district covered by the contract provision, see Pl.'s Resp. 13-14 (discussing its claim for breach of the 1965 Repayment Contract); cf. Def.'s App. A132 (1965 Repayment Contract).

Instead, plaintiff's argument that defendant has breached a duty to provide drainage pursuant to the 1965 Repayment Contract appears to be based on the fact that the interceptor drain and construction contemplated by the 1965 Repayment Contract were not completed.[12] See Pl.'s Resp. 13-14 (pointing to, apparently in support of its position that defendant was committed to providing drainage as contemplated by the 1965 Repayment Contract, maps showing the contemplated interceptor drain and other contemplated construction and the schedule for the proposed construction phases). Following completion of the first phase of construction, the government determined-- incorrectly, according to plaintiff--that funds were insufficient for the completion of the remaining two phases of contemplated construction. See Compl. ¶¶ 54-55. However, the availability of funds was a condition precedent for performance of the contemplated construction. See Def.'s App. A131 (1965 Repayment Contract). Moreover, plaintiff's own acknowledgment that "[t]he Contracts . . . set no definite time for the government to provide drainage services, to construct a drainage system or even to construct discrete increments of a drainage system," Pl.'s Resp. 10, belies plaintiff's assertion that the 1965 Repayment Contract obligated defendant to complete the contemplated construction. Instead, the 1965 Repayment Contract obligated plaintiff to repay the government for

---

[12] Defendant contends that, to the extent that plaintiff argues that a contractual obligation arose out of the 1965 Repayment Contract with respect to the interceptor drain, such an argument must fail because the 1965 Repayment Contract pertains only to local drainage systems. Def.'s Reply 17 (citing 43 U.S.C. § 485h(d)-(e) (2006)). The court does not address whether the distribution system covered by the 1965 Repayment Contract included the interceptor drain because, as discussed in Part III.A.1a.ii above, the court finds that plaintiff has not pleaded facts sufficient to allege any unmet contractual obligation to provide drainage. Therefore, the court need not reach the issue.

23

actual costs of building facilities that defendant had a statutory obligation to provide.  See San Luis Act § 1(a), 74 Stat. at 156; see also St. Christopher, 511 F.3d at 1384 (stating that the Federal Circuit "has been reluctant to find that statutory . . . provisions are incorporated into a contract with the government unless the contract explicitly provides for their incorporation").

Plaintiff's arguments to the contrary are not persuasive.  For example, plaintiff cites to the third and sixth explanatory recitals for the proposition that providing "a drainage collector system" was "[a]n expressed purpose of this agreement."  Pl.'s Resp. 12.  Those recitals state:

> WHEREAS, [Westlands], in order to utilize . . . the water supply made available under the [1963 Contract] and such future contracts as may be made between the United States and [Westlands], desires that a water distribution and drainage collector system be constructed for [Westlands water district] by the United States . . . pursuant to federal reclamation laws; and
> . . . .
>
> WHEREAS, the United States is willing to undertake the construction of the aforementioned water distribution and drainage collector system under the conditions hereinafter set forth[.]

Def.'s App. A130 (1965 Repayment Contract).  As discussed above with respect to the 1963 Contract, recitals are generally not considered contractual, and government representations are not binding contractual obligations unless stated as an undertaking rather than an intention.  See supra Part III.A.1.a.i.  Here, the third recital merely states plaintiff's desire that drainage be constructed, and the sixth recital expresses a government intention to undertake construction of drainage but does not itself contain a present undertaking.  Cf. Chattler, 632 F.3d at 1330 (stating that, to be binding, a government representation must be "stated in the form of an undertaking, not as a mere prediction or statement of opinion or intention" (internal quotation marks omitted)); Nat'l By-Prods., Inc., 186 Ct. Cl. at 560, 405 F.2d at 1264 (same).  However, even if the sixth recital could be interpreted as an undertaking to construct drainage, such an undertaking is limited by the terms of the 1965 Repayment Contract, which do not obligate defendant beyond the performance already rendered under the agreement because construction was conditioned on the availability of funds.  See Def.'s App. A131 (1965 Repayment Contract); cf. McAbee, 97 F.3d at 1435 (stating that unambiguous contract terms "must be given their plain and ordinary meaning").

Plaintiff also cites to the best efforts clause, by which the parties agreed to "'exert their best efforts to expedite the completion' of the 'distribution system.'"  Pl.'s Resp. 14

24

(quoting Def.'s App. at A132 (1965 Repayment Contract)). However, plaintiff merely quotes this provision without explaining how it supports plaintiff's position. See id.; see also Def.'s Reply 16 ("Westlands has not alleged the Government failed to comply with the . . . best efforts clause[] or identified any related damages"). Moreover, defendant argues that, in any event, such a claim would be time-barred. Def.'s Mot. 24; Def.'s Reply 16. Defendant is correct. The first phase of construction was completed in 1979, Compl. ¶ 52, so, to the extent that plaintiff is attempting to allege any breach of the best efforts clause with respect to the first phase of construction, such a claim would be time-barred, see 28 U.S.C. § 2501 (providing for six-year statute of limitation in the Court of Federal Claims). With respect to phases two and three of construction contemplated by the 1965 Repayment Contract, commencement of construction--conditioned on the availability of funds--was scheduled for 1974 and 1979, respectively. See Def.'s App. A131, A133 (1965 Repayment Contract). Therefore, any claim alleging a breach of the best efforts clause as a result of defendant's determination that funds were not available to begin construction of phases two and three at the anticipated times would also be time-barred. See 28 U.S.C. § 2501. Finally, the maps relied on by plaintiff, "show[ing] drainage facilities, including the Interceptor Drain," and the "drainage collector system" do not constitute a "commitment" by the government to provide drainage, cf. Pl.'s Resp. 13-14, but reflect, at most, the intent of the government to complete the construction in accordance with the maps, cf. Chattler, 632 F.3d at 1330; Nat'l By-Prods.,Inc., 186 Ct. Cl. at 560, 405 F.2d at 1264.

Plaintiff's citations to the 1965 Repayment Contract--without explanation or analysis--and conclusory statement that "a clearer commitment to provide drainage is hard to imagine," see Pl.'s Resp. 13-14, do not suffice to state a claim upon which relief can be granted, cf. Iqbal, 556 U.S. at 678. Plaintiff has not alleged facts sufficient to state a facially plausible claim for relief based on an express breach of the 1965 Repayment Contract. See id.; Twombly 550 U.S. at 570.

     iii.    2007 Interim Contract

Plaintiff argues that "the 2007 Interim Renewal Contract carried forward the drainage obligations created by the 1963 and 1965 Contracts," Pl.'s Resp. 14 (capitalization and emphasis omitted), and did not "abrogate[e] the obligation to provide drainage created by the 1963 and 1965 Contracts," id. at 16. However, neither the 1963 Contract nor the 1965 Repayment Contract created a drainage obligation, see supra Parts III.A.1.a.i-ii, and any references that they make to defendant's statutory drainage obligation did not transform it into a contractual one, cf. St. Christopher, 511 F.3d at 1384. Nor do the specific provisions of the 2007 Interim Contract cited by plaintiff give rise to such an obligation.

First, plaintiff cites a number of recitals to the 2007 Interim Contract and states that in those recitals, defendant "acknowledge[d] its obligation to provide drainage under Firebaugh,"[13] represented its intention, "to the extent appropriated funds are available, to develop and implement" drainage solutions for the San Luis unit, and noted actions it has

---

[13] After the completed portion of the interceptor drain was closed in 1986, Westlands and other landowners inside and outside the San Luis unit sued the government in Sumner Peck Ranch, Inc. v. Bureau of Reclamation (Sumner Peck), 823 F. Supp. 715 (E.D. Cal. 1993), and Firebaugh Canal Co. v. United States (Firebaugh), 203 F.3d 568 (9th Cir. 2000), seeking completion of the interceptor drain. See Firebaugh, 203 F.3d at 572 (citing, inter alia, Sumner Peck, 823 F. Supp. 715); Compl. ¶ 81. These lawsuits were partially consolidated in Firebaugh in 1992 "to resolve the plaintiffs' mutual allegation that the Secretary of the Interior is required by law to construct facilities to drain agricultural drainage water from certain lands in Westlands Water District." Firebaugh, 203 F.3d at 572; see Compl. ¶ 81.

With respect to the consolidated portion of the cases, the district court in Firebaugh concluded "that the San Luis Act established a mandatory duty to provide drainage that had not been excused" by impossibility. Firebaugh, 203 F.3d at 572. In 1995, the district court entered partial final judgment on that issue and ordered the government to "'without delay, take such reasonable and necessary actions to promptly prepare, file, and pursue an application for a discharge permit for the [interceptor drain] to comply with . . . the San Luis Act to provide drainage to the San Luis Unit.'" Mem. Decision Granting Fed. Defs.' Mot. for Entry of J. (Firebaugh J. Order) at 2, Firebaugh, Nos. 1:88-cv-00634 LJO DLB & 1:91-cv-00048 LJO DLB (partially consolidated), Dkt. No. 943 (E.D. Cal. Mar. 13, 2012) (quoting Order of Mar. 12, 1995, Dkt. No. 442, at 11-12).

On appeal, the United States Court of Appeals for the Ninth Circuit (Ninth Circuit) affirmed the government's "duty to provide drainage service under the San Luis Act" but reversed the portion of the district court judgment "that foreclose[d] non-interceptor drain solutions," stating that "subsequent Congressional action has given discretion to the Department [of Interior] in creating and implementing a drainage solution." Firebaugh, 203 F.3d at 578. The Ninth Circuit further declared that "the time has come for the Department of Interior and the Bureau of Reclamation to bring the past two decades of studies, and the 50 million dollars expended pursuing an 'in valley' drainage solution, to bear in meeting its duty to provide drainage under the San Luis Act." Id. On remand in 2000, the government was "ordered to submit 'a detailed plan describing the action . . . they will take to promptly provide drainage to the San Luis Unit.'" Firebaugh J. Order 2 (quoting Order of Dec. 18, 2000, Dkt. No. 654, at 4). Final judgment was ordered in the Firebaugh case on March 19, 2012--after the remaining claims in the case were resolved--but the final judgment did not disturb the partial final judgment concerning the government's statutory duty to provide drainage to the San Luis unit. Final J. on Claims in Pls.' Fifth Am. Compl. at 1, Firebaugh, Nos. 1:88-cv-00634 LJO DLB & 1:91-cv-00048 LJO DLB (partially consolidated), Dkt. No. 945 (E.D. Cal. Mar. 19, 2012). The district court retains jurisdiction to enforce the partial final judgment. Id. at 1-2; see also Firebaugh J. Order 2 (stating that, following the partial judgment, the district court reserved jurisdiction to enforce compliance).

26

taken toward providing a drainage solution. Pl.'s Resp. 15 (internal quotation marks omitted) (citing Def.'s App. A49-50 (2007 Interim Contract)). Defendant responds that "the recitals identified by Westlands refer and relate to the Government's obligation to provide drainage and the efforts taken in that regard; they are not relevant to any potential contractual obligation." Def.'s Reply 14. Defendant is correct.

Recitals are generally not considered contractual, and government representations are not binding contractual obligations unless stated as an undertaking rather than an intention. See supra Part III.A.1.a.i. The recitals cited by plaintiff contain only statements of intention or representations of actions already taken, not contractual statements of a present undertaking. Cf. Chattler, 632 F.3d at 1330; Nat'l By-Prods., Inc., 186 Ct. Cl. at 560, 405 F.2d at 1264. Further, the reference in a recital to Firebaugh, 203 F.3d 568, relates to defendant's statutory duty to provide drainage, see id. at 578 (affirming the trial court's holding that the government had a statutory duty under the San Luis Act to provide drainage to Westlands, but reversing the trial court's holding that the government's drainage obligation was required to be satisfied by the construction of an interceptor drain)--and does not purport to incorporate this statutory duty into the contract, cf. St. Christopher, 511 F.3d at 1384. Plaintiff has not alleged facts sufficient to support a drainage obligation arising out of the explanatory recitals to the 2007 Interim Contract.

Plaintiff also cites, see Pl.'s Resp. 15, a drainage service rate provision of the 2007 Interim Contract (the drainage service rate provision), which provides, "The Contracting Officer shall notify the contractor in writing when drainage service becomes available . . . [and thereafter] shall provide drainage service to [Westlands] at rates established pursuant to then-existing ratesetting policy for Irrigation Water," Def.'s App. A82 (2007 Interim Contract); see id. at A112 (2007 Interim Contract Ex. B (2007 rates and charges)) (showing a 2007 rate of twenty-four cents for operation and maintenance of the interceptor drain). However, any drainage obligation contained in this drainage service rate provision is expressly conditioned on drainage service becoming available, see id. at A82 (2007 Interim Contract), and this condition has not been met. Nonetheless, plaintiff appears to suggest that the drainage service rate provision, along with the 2007 rates and charges included as Exhibit B to the 2007 Interim Contract, create an affirmative contractual obligation of the government to make drainage service available--but plaintiff neither expressly makes that argument nor explains how these provisions would give rise to such an obligation. See Pl.'s Resp. 15-16. Defendant responds that "[the drainage service rate] provision is merely a notification provision and does not give rise to a duty to provide drainage" and that drainage-related rate information in the contract--like the rate information set forth in the 1963 Contract--provides only "the rate information . . . required by statute but contains no language by which the United States undertakes any drainage obligation." Def.'s Reply 14.

27

Defendant is correct:  such a provision is entirely consistent with defendant's statutory duty to provide drainage and does not constitute a contractual undertaking to provide drainage service.  At most it represents defendant's prediction or intent that drainage service will be provided to Westlands in the future.  Cf. Chattler, 632 F.3d at 1330; Nat'l By-Prods.,Inc., 186 Ct. Cl. at 560, 405 F.2d at 1264.  Moreover, there is no language in either the drainage service rate provision, see Def.'s App. A82 (2007 Interim Contract), or the 2007 rates and charges in Exhibit B to the 2007 Interim Contract, see id. at A112 (2007 Interim Contract Ex. B (2007 rates and charges)), that creates an express obligation to provide drainage service.  Pursuant to federal reclamation law, a water service contract must include "such rates as in the Secretary's judgment will produce revenues at least sufficient to cover an appropriate share of the annual operation and maintenance cost and an appropriate share of such fixed charges as the Secretary deems proper."  43 U.S.C. § 485h(e).  As with the 1963 Contract, see supra Part III.A.1.a.i, the inclusion of drainage-related rate information reflects only estimated annual operating and maintenance costs and other fixed charges with respect to future drainage service anticipated by defendant; it is not an affirmative present undertaking by the government to provide drainage service, cf. Chattler, 632 F.3d at 1330; Nat'l By-Prods., Inc., 186 Ct. Cl. at 560, 405 F.2d at 1264.

Therefore, with respect to the 2007 Interim Contract, plaintiff has not pleaded facts that would "raise a right of relief above the speculative level."  Cf. Twombly, 550 U.S. at 555.

iv.     2010 Interim Contract

The 2010 Interim Contract incorporated the terms of the 2007 Interim Contract.  See Def.'s App. A122 (2010 Interim Contract); Compl. ¶ 46; Def.'s Mot. 6.  Plaintiff does not allege that this contract created a separate contractual right to drainage service but, instead, asserts that it did not "abrogate the obligation to provide drainage created by the 1963 and 1965 Contracts."  Pl.'s Resp. 16.  However, because neither the 1963 Contract nor the 1965 Repayment Contract created a general drainage obligation, see supra Parts III.A.1.a.i-ii, plaintiff's argument fails.  Accordingly, plaintiff has not pleaded facts that would "raise a right of relief above the speculative level" with respect to the 2010 Interim Contract.  Cf. Twombly, 550 U.S. at 555.

Although the court is required to "accept as true all the factual allegations in the complaint" and to "make all reasonable inferences in favor of the non-movant" when ruling on a 12(b)(6) motion, Sommers Oil, 241 F.3d at 1378, the court is "not bound to accept as true a legal conclusion couched as a factual allegation," Papasan, 478 U.S. at 286; see Twombly, 550 U.S. at 555.  Here, plaintiff has pointed to a number of contractual provisions that, it contends, constitute an express obligation to provide drainage to Westlands.  See supra Part III.A.1.a.  However, plaintiff's legal conclusion is

28

simply not supported by the plain language of the contracts.  See supra Part III.A.1.a; cf. McAbee, 97 F.3d at 1435.  Indeed, as plaintiff points out, "[t]he Contracts . . . set no definite time for the Government to provide drainage services, to construct a drainage system or even to construct discrete increments of a drainage system.  Nor did they even set forth a construction schedule."  Pl.'s Resp. 10.  Accordingly, the court holds that no provision of the 1963 Contract, the 1965 Repayment Contract, the 2007 Interim Contract nor the 2010 Interim Contract creates an express contractual obligation of defendant to provide drainage to Westlands.[14]

        b.        Past Breaches of Implied Contractual Obligation

Defendant contends that plaintiff "has not alleged any facts that would show the existence of an implied contractual obligation," both because an implied contract cannot exist when an express contract between the parties governs the same subject and because plaintiff has not alleged any facts sufficient to show the existence of a separate implied contract.  Def.'s Mot. 24-25.  With respect to the first issue raised by defendant, plaintiff responds that, if the court concludes that there is no express contract with regard to drainage, an implied contract can be found, Pl.'s Mot. 17, and that, "[m]oreover, the implied contract Westlands alleges can be upheld as a modification of the express contract," id. at 18.  With respect to the second issue raised by defendant, plaintiff states that its "Complaint alleges a multitude of specific facts that would support a finding of a contract implied in fact, or an amendment of the express contracts by subsequent words and conduct."  Id. at 19.  Plaintiff states that these alleged facts include:  the fact that drainage is necessary for irrigation, the inclusion of a drainage component in plaintiff's water service contract rates since 1967, plaintiff's consistent payment of drainage-related charges, the court's "holding" in Westlands I, the various explanatory recitals cited by plaintiff in which defendant expresses an intent to provide drainage and plaintiff's reliance on defendant's expressed intent to provide drainage.  Id.

An implied-in-fact contract requires a "meeting of the minds," which "is inferred, as a fact, from conduct of the parties showing . . . their tacit understanding."  Trauma Serv. Grp., 104 F.3d at 1326 (internal quotation marks omitted); cf. Anderson, 344 F.3d at 1353 (requiring mutuality of intent to contract).  "In short, an implied-in-fact contract arises when an express offer and acceptance are missing but the parties' conduct indicates

---

    [14] Westlands argues that, "[a]t the most[,] from the perspective of the Government's Motion, the Contracts are ambiguous as to the existence of [a drainage] obligation, and the Motion must be denied for that reason alone."  Pl.'s Resp. 16 n.6.  However, the court finds that the plain language of the contracts does not give rise to a contractual drainage obligation and, therefore, that the contracts are not ambiguous with respect to that issue.  See Dart Advantage Warehous., Inc. v. United States, 52 Fed. Cl. 694, 700 (2002) ("It is not enough that the parties differ in their interpretation of the contract clause.") (citing Cmty. Heating & Plumbing Co. v. Kelso, 987 F.2d 1575, 1578 (Fed. Cir. 1993)).

mutual assent." City of Cincinnati v. United States, 153 F.3d 1375, 1377 (Fed. Cir. 1998). As with an express contract, an implied-in-fact contract with the United States requires a government agent with actual authority to contract. Id. at 1377; Trauma Serv. Grp., 104 F.3d at 1326. The "risk of having accurately ascertained that he who purports to act for the government does in fact act within the bounds of his authority" is assumed by the private contracting party. Schism v. United States, 316 F.3d 1259, 1278 (Fed. Cir. 2002) (citing Fed. Crop Ins. Corp. v. Merrill, 332 U.S. 380, 384 (1947)). An implied-in-law contract, on the other hand, imputes a promise to perform a legal duty by fiction of law when no intent to contract is shown. Algonac Mfg. Co. v. United States, 192 Ct. Cl. 649, 674, 428 F.2d 1241, 1255 (1970) (citing Balt. & Ohio R.R. v. United States, 261 U.S. 592, 597 (1923) and 17 C.J.S. Contracts § 4 (1963)). The Court of Federal Claims has jurisdiction over claims involving implied-in-fact contracts but lacks jurisdiction over claims based on contracts implied in law. Id. at 1256.

Regarding the issue of whether an implied contract and express contract can coexist, "[i]t is well settled that the existence of an express contract precludes the existence of an implied-in-fact contract dealing with the same subject matter, unless the implied contract is entirely unrelated to the express contract." Schism, 316 F.3d at 1278; see Trauma Serv. Grp., 104 F.3d at 1326. Here, the facts cited by plaintiff in support of its implied contract argument do not support such an argument because they are too closely related to the subject matter of the express contracts. Cf. Schism, 316 F.3d at 1278; Trauma Serv. Grp., 104 F.3d at 1326. Indeed, the facts cited by plaintiff in support of its implied contract claim consist primarily of portions of the four express contracts and examples of plaintiff's performance under those contracts, specifically: inclusion of a drainage component in plaintiff's water service contract rates since 1967, plaintiff's consistent payment of drainage-related charges pursuant to each of the contracts, defendant's intent to provide drainage expressed in explanatory recitals to the contracts, and plaintiff's purchase of water from defendant pursuant to the water service contracts. Pl.'s Resp. 19. These facts do not support plaintiff's implied contract argument because an implied contract based on portions of the express contracts or plaintiff's performance under them would be related to the express contracts and deal with the same subject matter. Cf. Schism, 316 F.3d at 1278 (stating that "an express contract precludes the existence of an implied-in-fact contract dealing with the same subject matter"). Plaintiff also cites the court's holding in Westlands I in support of its implied contract claim. Pl.'s Resp. 19. However, plaintiff's assertion that the Westlands I court "held that both water and drainage service were the predominant benefit of the bargain to Westlands under the Contracts," id. (internal quotation marks omitted), is an assertion of a fact that, if true, would be related to the express contracts because it is an interpretation of the express contracts--and, therefore, could not support an implied contract claim that was "entirely unrelated to the express contract[s]," cf. Schism, 316 F.3d at 1278.

Finally, plaintiff asserts in support of its implied contract claim the additional fact that drainage is necessary for irrigation.  Pl.'s Resp. 19.  However, this fact does not implicate any conduct by the parties from which mutual assent can be inferred and, therefore, does not support plaintiff's implied contract claim.  Cf. City of Cincinnati, 153 F.3d at 1377 (stating that an implied contract arises when "the parties' conduct indicates mutual assent").

Plaintiff's breach of implied contract claim fails because any implied contract that could arise from the facts pleaded by plaintiff would be precluded owing to the close relationship between the facts pleaded by plaintiff and the subject matter of the express contracts.  Cf.  Schism, 316 F.3d at 1278; see Trauma Serv. Grp., 104 F.3d at 1326.  Plaintiff has not pleaded other, unrelated facts sufficient to allow the court to draw a reasonable inference that the parties mutually assented to a contractual drainage obligation.  Cf. Iqbal, 556 U.S. at 678; Anderson, 344 F.3d at 1353.

Similarly, plaintiff also fails to show that the implied contract it alleges was a modification of the express contracts because most of the facts cited by plaintiff as evidence of an implied contract are either provisions of the express contracts or examples of plaintiff's performance in compliance with them.  Cf. Pl.'s Resp. 19 (listing "specific facts" that plaintiff claims "would support a finding of a contract implied in fact, or an amendment of the express contracts by subsequent words and conduct").  In other words, the facts alleged by plaintiff do not show any modification or amendment to the contracts because they consist of the contract terms themselves, provide an alleged interpretation of the contract terms or are consistent with performance of the contract terms--none of which tends to show amendment or modification of the contract terms.

2.      Claims Three to Five:  Related Breach of Contract Claims

a.      Breach of Implied Obligation of Good Faith and Fair Dealing

Government contracts, like all other contracts, include an implied duty of good faith and fair dealing, which requires that each party not interfere with the other party's rights under the contract.  Precision Pine & Timber, Inc. v. United States (Precision Pine), 596 F.3d 817, 828 (Fed. Cir. 2010); Centex Corp. v. United States (Centex), 395 F.3d 1283, 1304 (Fed. Cir. 2005).  Because this implied duty protects contractual rights, exactly what it "entails depends in part on what [a given] contract promises."  Precision Pine, 596 F.3d at 830; see Scott Timber Co. v. United States, 692 F.3d 1365, 1372 (Fed. Cir. 2012) ("[T]he existence of the covenant of good faith and fair dealing depends on the existence of an underlying contractual relationship . . . ." (brackets and internal quotation marks omitted)).  Significantly, a party's contractual obligations are not expanded by the implied duty of good faith and fair dealing.  Precision Pine, 596 F.3d at 831; see Bradley v. Chiron Corp., 136 F.3d 1317, 1326 (Fed. Cir. 1998) (citing Racine & Laramie, Ltd. v.

31

Cal. Dep't of Parks & Recreation, 14 Cal. Rptr. 2d 335, 339 (Cal. Ct. App. 1992) for the proposition that "implied covenants of good faith and fair dealing are limited to assuring compliance with the express terms of the contract and [cannot] be extended to create obligations not contemplated in the contract").

To support a claim for breach of the implied obligation of good faith and fair dealing with respect to a government contract, a plaintiff must show that the government acted in a way "specifically designed to reappropriate the benefits the other party expected to obtain from [the contract], thereby abrogating the government's obligations under the contract." Precision Pine, 596 F.3d at 829; Centex, 395 F.3d at 1311. In other words, "liability only attaches if the government action 'specifically targeted' a benefit" of the government contract at issue, Precision Pine, 596 F.3d at 830, "so as to destroy the reasonable expectations of the other party regarding the fruits of the contract," Centex, 395 F.3d at 1304. A showing of bad faith is not an element of the claim. See Precision Pine, 596 F.3d at 830. When a contractual benefit is expressly qualified, there is no breach of the duty of good faith and fair dealing when interference with contractual performance is in the manner contemplated and provided for. Id. at 830-31.

Here, plaintiff's claim focuses principally on allegations of bad faith, as evidenced by plaintiff's contention that "the government's bad faith is palpable and specifically and exhaustively pled." Pl.'s Resp. 20 (capitalization and emphasis omitted). In support of this contention, plaintiff points to the closing of the Kesterson Reservoir and completed portion of the interceptor drain and the fact that the government has not provided drainage since Westlands' local drainage collector system was plugged in 1986. Id. Plaintiff also points to prior litigation, including Barcellos and Firebaugh, citing the government's failure to provide drainage pursuant to court orders in those cases as further evidence of bad faith. Id. at 21-22. Finally, plaintiff alleges that a 2010 letter from the Commissioner of the Bureau of Reclamation to United States Senator Diane Feinstein (the Feinstein Letter) "abandoned Westlands to its own devices, stating that if the local water districts did not come up with a drainage solution themselves, the [Bureau of Reclamation] would cut off their water." Id. at 22. Plaintiff summarizes its argument:

> And so here we are, 12 years after the [Firebaugh court] ordered the Government to provide actual drainage "promptly," and 26 years after the drain was plugged, without a spade in the ground, without one yard of earth moved, without one drainage-related facility built and with not a drop of water being drained from Westlands' lands.

Id. Defendant responds that "Westlands has failed to show a contractual obligation to provide drainage to which the duty of good faith and fair dealing could attach," a failure that, defendant contends, is "fatal to [plaintiff's] claim of breach of the implied duty of good faith and fair dealing." Def.'s Mot. 26.

32

Defendant is correct. As discussed in detail above, plaintiff has failed to show a contractual duty to provide drainage arising out of any of the 1963 Contract, the 1965 Repayment Contract, the 2007 Interim Contract, the 2010 Interim Contract or any implied contract. See Part III.A.1. Therefore, there is no contractual drainage duty to which the implied duty of good faith and fair dealing can attach. Cf. Precision Pine, 596 F.3d at 830 (stating that the implied duty of good faith and fair dealing depends on what is promised in a given contract). Further, plaintiff has not shown that defendant acted to deprive plaintiff of the fruits of the contracts or to abrogate governmental obligations under the contracts. Because plaintiff failed to show that drainage service was a bargained-for benefit of any of these contracts, plaintiff has not shown that drainage service is a "fruit" of any of the contracts. Cf. Centex, 395 F.3d at 1304 (stating that a breach of the implied obligation of good faith and fair dealing occurs when a party "destroy[s] the reasonable expectations of the other party regarding the fruits of the contract"). Nor could any contractual drainage obligation of the government be abrogated when no such obligation existed. Cf. Precision Pine, 596 F.3d at 829 (stating that a claim for breach of the implied duty of good faith and fair dealing requires a showing of an abrogation of the government's obligations under the contract); Centex, 395 F.3d at 1311.

Moreover, the contracts specifically contemplated that funds may not be available for completing the planned drainage system construction. The construction contemplated by the 1965 Repayment Contract was expressly conditioned on the availability of funds, see supra Part III.A.1.a.ii, and the 1963 Contract included a provision that stated that, with respect to any performance of the United States that required appropriations by Congress or other allotment of funds, the unavailability of such funds would "not relieve [Westlands] from any obligations then accrued under this contract, and no liability [would] accrue to the United States in case such funds are not appropriated or allotted," Def.'s App. A39 (1963 Contract). By the plain language of the contract, plaintiff accepted the risk that it would have to keep making payments under the 1963 Contract, including the drainage component, even if drainage was not constructed. Cf. Precision Pine, 596 F.3d at 830-31 (stating that there was no violation of the implied duty of good faith and fair dealing when interference with performance was contemplated and provided for in the contract).

For these reasons, plaintiff's attempt to use the implied duty of good faith and fair dealing to expand the government's contractual obligations fails. Cf. Precision Pine, 596 F.3d at 831 (stating that the implied duty of good faith and fair dealing cannot be used to expand contractual obligations); Bradley, 136 F.3d at 1326. Plaintiff, therefore, has not pleaded sufficient facts to state a plausible claim for relief on the theory that the government breached an implied obligation of good faith and fair dealing. Cf. Iqbal, 556 U.S. at 678.

b.      Total Breach of Contractual Drainage Obligations[15]

A total breach of contract occurs when the breach "'so substantially impairs the value of the contract to the injured party at the time of the breach that it is just in the circumstances to allow him to recover damages based on all his remaining rights to performance.'" Hansen Bancorp, Inc. v. United States (Hansen), 367 F.3d 1297, 1309 (Fed. Cir. 2004) (quoting Restatement (Second) of Contracts § 243(4)).  To establish a total breach, a plaintiff must show that the breach was "material, substantial, essential, or vital"--that it "went to the root of the defendant's [contractual] obligation." First Annapolis Bancorp, Inc. v. United States (First Annapolis), 89 Fed. Cl. 765, 800 (2009) (internal quotation marks omitted); Restatement (Third) of Restitution and Unjust Enrichment § 37 cmt. c (2011).  When a party to a contract is in total breach, the non-breaching party may elect "to declare the contract terminated and sue for total breach or to continue the contract and sue for partial breach." Pac. Gas & Electric Co. v. United States (PG&E), 70 Fed. Cl. 766, 771 (2006); see Cities Serv. Helex, Inc. v. United States, 211 Ct. Cl. 222, 234-35, 543 F.2d 1306, 1313 (1976).  However, a party waives it right to restitution for total breach when it accepts or receives partial performance. See Mobil Oil Exploration & Producing Se., Inc. v. United States (Mobil Oil), 530 U.S. 604, 622 (2000) ("[A]cceptance of performance under a once-repudiated contract can constitute a waiver of the right to restitution that repudiation would otherwise create."); PG&E, 70 Fed. Cl. at 772.

Here, plaintiff contends that it "contracted for the provision of drainage in 1963 and 1965," but, "since 1986, the Government has provided only studies, evaluations, and planning" while "Westlands has been continuously paying for drainage." Pl.'s Resp. 24.  Plaintiff concludes, "This is as total a breach as there can be." Id.  Defendant does not address plaintiff's total breach claim specifically but contends that "Westlands failed to state a claim upon which relief can be granted because it failed to identify any contract provision that created a drainage obligation arising out of any of the contracts at issue. . . . Thus, Westlands'[] breach of contract claims fail." Def.'s Reply 1-2; cf. Pl.'s Resp. 23 ("[T]he Government appears to limit its theory here to the claim that there is no contractual obligation to be totally breached.").

---

[15] Plaintiff reasons that its fourth claim for relief (total breach) is distinct from its first three breach of contract claims (past breaches of an express or implied contractual drainage obligation, see supra Part III.A.1, and past breach of the implied obligation of good faith and fair dealing, see supra Part III.A.2.a) because, although those claims "seek damages for the Government's failure to provide drainage in the past," "this claim looks to the future[] and claims damages for the remaining performance due under the contract," Pl.'s Resp. 23.  It is unclear, therefore, whether plaintiff asserts partial breach claims in its first three claims (as distinguished from its total breach claim asserted in claim four), or whether plaintiff is asserting different claims based on different theories of damages.  Plaintiff's theory of partial breach is discussed further in Part III.B.1.a.i.

Defendant is correct: plaintiff's claim of total breach fails because plaintiff has not alleged a breach of defendant's remaining contractual obligations. Cf. First Annapolis, 89 Fed. Cl. at 800; Restatement (Third) of Restitution and Unjust Enrichment § 37 cmt. c. As discussed above, see supra Part III.A.1, plaintiff did not contract for the provision of drainage in any of the contracts at issue. Accordingly, plaintiff has no remaining right to the government's performance of a contractual drainage obligation under any of these contracts because no such right or obligation ever existed. Cf. Hansen, 367 F.3d at 1309 (stating that a claim for material breach allows a party to recover damages for its remaining rights to performance under the contract); Restatement (Second) of Contracts § 243(4).

Plaintiff's claim for total breach also fails because plaintiff has accepted performance by defendant under all of the contracts. Cf. Mobil Oil, 530 U.S. at 622 (stating that acceptance of part performance after repudiation constitutes waiver of restitution damages); PG&E, 70 Fed. Cl. at 772. In particular, the payments plaintiff made pursuant to the 1965 Repayment Contract were for the actual costs of constructing phase one of the contemplated drainage system, see 1939 Act § 9(d), 53 Stat. at 1195 (codified as amended at 43 U.S.C. § 485h(d)) (governing repayment contracts), which served Westlands from 1979 through 1985, Compl. ¶ 58; Def.'s Mot. 7. In other words, plaintiff's payments under the 1965 Repayment Contract were payments for performance already rendered. With respect to the water service contracts, plaintiff received water from defendant, pursuant to the 1963 Contract, beginning in 1967. Compl. ¶ 20; Def.'s Mot. 5. After the expiration of the 1963 Contract, plaintiff received water from defendant pursuant to further contracts for water service, including the 2007 and 2010 Interim Contracts, see supra Parts I.B.3-4, and plaintiff receives water from defendant presently, Def.'s Mot. 8; see Pl.'s App. 9-39 (2012 interim renewal contracts) (providing for water service into 2014). These facts indicate that plaintiff has accepted and continues to accept at least part performance under the water service contracts. Plaintiff argues that the government's obligation to provide water "is separate and divisible from its obligation to provide drainage," Compl. ¶ 156, but no such contractual drainage obligation exists, see supra Part III.A.1. Moreover, the 1963 Contract states that it is "indivisible for purposes of validation."[16] Def.'s App. A42 (1963 Contract).

For these reasons, the facts asserted by plaintiff do not state a plausible claim for relief based on a total breach theory. Cf. Iqbal, 556 U.S. at 678.

---

[16] The court understands the phrase "indivisible for purposes of validation" to indicate that the parties intended the contract to be entire and not severable. Cf. 17A C.J.S. Contracts § 443 (2012) (stating that "[t]he intention of the parties is a primary consideration in the determination of whether a contract is entire or severable" and "is to be ascertained from the terms or language of the contract," among other factors).

35

c.       Anticipatory Breach of Contractual Drainage Obligations

Anticipatory breach, also known as repudiation, occurs when a contractually obligated party communicates that it will commit a breach that would constitute a total breach.  See Mobil Oil, 530 U.S. at 608 (citing Restatement (Second) of Contracts §§ 243, 250, 373); Dow Chem. Co. v. United States, 226 F.3d 1334, 1344 (Fed. Cir. 2000).  The repudiating party's refusal to perform its contractual obligation must be made "distinctly and unqualifiedly to the other party."  Dow Chem. Co., 226 F.3d at 1334.  An act may constitute a repudiation if it is "voluntary and affirmative" and "make[s] it actually or apparently impossible for [the obligated party] to perform."  Restatement (Second) of Contracts § 250 cmt. c.

Plaintiff contends that the Feinstein Letter "is as clear a repudiation of the drainage obligation as there can be."  Pl.'s Resp. 25.  However, as discussed above, see supra Part III.A.1, no such contractual drainage obligation existed to be repudiated.  Further, plaintiff has not shown that the letter is a distinct, unqualified refusal to perform a contractual duty, made by defendant to plaintiff.  Cf. Dow Chem. Co., 226 F.3d at 1334.  In particular, the letter cannot be characterized as the government's making a repudiation to Westlands because the letter was not addressed to Westlands.  Compl. Ex. A (Feinstein Letter) 1.  In addition, the letter did not even mention a contractual drainage obligation.  Instead, it acknowledged the government's statutory drainage obligation and discussed the steps being taken to comply with that obligation.  See id. at 1-2 (acknowledging the holding in Firebaugh that the "San Luis Act imposes on the Secretary a duty to provide drainage service to the [San Luis] Unit," discussing Interior's inability to implement a 2007 record of decision (the 2007 record of decision), and stating that sufficient appropriations "remained to allow Interior to construct one subunit of drainage facilities within Westlands Water District").  The letter also sought legislative assistance to comply with defendant's statutory drainage obligation, stating that, beyond one subunit of drainage facilities, Interior "will be unable to proceed without additional Congressional authorization."  Id. at 2.  Finally, the letter requested a legislative response and described "key elements of a long-term legislative drainage strategy" that the Administration would support.  Id. at 2-4.  These key elements included transferring irrigation drainage responsibility to local control, id. at 2, which plaintiff appears to have misinterpreted as a declaration "that from now on, the drainage obligation falls to the water districts on pain of losing their water," see Pl.'s Resp. 25.  Nowhere does the letter say that defendant refuses to perform a contractual drainage obligation.

Plaintiff also contends that "the Government's forty years of failing to provide drainage and temporizing over the last twenty-six years is conduct from which a repudiation can be inferred."  Id. at 26 (citing Restatement (Second) of Contracts § 250).  However, for an act to constitute repudiation, it "must be both voluntary and affirmative, and must make it actually or apparently impossible for [the obligated party] to perform."

Restatement (Second) of Contracts § 250 cmt. c.  The government's failure to provide drainage is not an affirmative act, nor has plaintiff alleged that it makes it actually or apparently impossible for the government to provide drainage in the future.  Cf. id.  And plaintiff has not shown any contractual obligation to provide drainage in the first place.  See Part III.A.1.

Plaintiff has failed to allege facts sufficient to state a plausible claim for relief based on an anticipatory breach theory.  Cf. Iqbal, 556 U.S. at 678.

        3.      Claim Six:  Declaratory Relief Regarding Amounts to Be Paid Under the 1965 Repayment Contract and Any Future Repayment Contracts

Plaintiff requests that, if the court finds neither a total breach nor an anticipatory breach of a contractual drainage obligation by defendant, Compl. ¶ 165, that the court grant declaratory judgment for Westlands "that any obligations [plaintiff] has under Section 9(d) of the [1939 Act], 43 U.S.C. § 485h(d), the 1965 Repayment Contract and/or any future repayment contracts must be based on inflation adjusted dollars going back to when the work should have been done," id. ¶ 176.  Defendant, without explaining its rationale, moves to dismiss this claim pursuant to RCFC 12(b)(6).  See Def.'s Mot. 1.

The 1965 Repayment Contract, governed by 43 U.S.C. § 485h(d), where section 9(d) of the 1939 Act has been codified, provides for repayment of actual construction costs of the San Luis Unit.  See supra Part I.B.2.  In or about 1979, when the subsurface drainage system was connected to the completed portion of the interceptor drain and began providing drainage service to Westlands, see Compl. ¶ 52, plaintiff began making payments pursuant to the 1965 Repayment Contract for the actual costs of that completed phase of construction, id. ¶¶ 40, 53.  Thus, all repayments made by plaintiff pursuant to the 1965 Repayment Contract were for construction completed by 1979.  Plaintiff now appears to contend that the first phase of construction--and the entire contemplated drainage system--should have been completed in or around 1967, see id. ¶ 169, when the distribution system began delivering water to Westlands, id. ¶ 20.  Plaintiff argues that it "should not be held responsible for" the "exponential[]" "escalation in construction costs . . . due to the Government's breach of its obligation to build the required drainage system in a timely manner."  Id. ¶¶ 170-72.

The plain language of the statute and the 1965 Repayment Contract make clear that plaintiff is obligated to repay the actual costs of construction, with no provision for adjustment for inflation.  Nothing in the language of the statute indicates that a party to a repayment contract has a right to adjust the actual costs of construction for inflation.  Instead, the statute provides that "the part of the construction costs allocated by the Secretary to irrigation shall be included in a general repayment obligation."  43 U.S.C. § 485h(d)(2).  Similarly, the 1965 Repayment Contract provides that "[Westlands] shall

37

repay to the United States the <u>actual cost</u> of the distribution system constructed and acquired pursuant to [the terms of the 1965 Repayment Contract]." Def.'s App. A134 (1965 Repayment Contract) (emphasis added).

Because plaintiff has not shown that either the 1965 Repayment Contract or the applicable federal reclamation laws would allow it to pay less than the actual costs of construction, plaintiff has failed to plead facts that raise a right to declaratory relief above a speculative level. <u>Cf.</u> <u>Twombly</u>, 550 U.S. at 555.

B.      This Court Lacks Jurisdiction over Plaintiff's Claims, in Part

For the reasons stated in Part III.A, plaintiff has not pleaded facts sufficient to state a claim on which relief can be granted with respect to claims one through six. Defendant also moves under 12(b)(1) to dismiss plaintiff's claims one through four and six for lack of subject matter jurisdiction. If a court determines that it does not have subject matter jurisdiction over a claim, it must dismiss the claim. <u>See</u> RCFC 12(h)(3). The plaintiff bears the burden of showing jurisdiction by a preponderance of the evidence. <u>Taylor</u>, 303 F.3d 1357, 1359 (Fed. Cir. 2002).

1.      Statute of Limitations

The Court of Federal Claims has an absolute, jurisdictional six-year statute of limitations, <u>John R. Sand & Gravel Co.</u>, 552 U.S. at 133-34, which is measured from the date on which a claim first accrues, 28 U.S.C. § 2501. A claim first accrues "'when all the events have occurred which fix the liability of the Government and entitle the claimant to institute an action.'" <u>Brighton Vill. Assocs.</u>, 52 F.3d at 1060 (quoting <u>Kinsey</u>, 852 F.2d at 557).

When a breach of contract claim is based on a failure to act, there are two prerequisites for accrual: (1) performance must be due, <u>see</u> <u>id.</u> (stating that a breach of contract claim arises when "a plaintiff had done all he must do to establish his entitlement to [performance] and the defendant does not [perform]"); <u>see e.g.</u>, <u>Brown Park</u>, 127 F.3d at 1455 (stating that breach of contract claim based on government's failure to make proper rent adjustments accrued at specified times when the government failed to make the adjustments in violation of the contracts at issue), and (2) the plaintiff must have suffered damages because performance was not rendered, <u>see</u> <u>Alder Terrace, Inc. v. United States</u>, 161 F.3d 1372, 1377 (Fed. Cir. 1998) (finding that claim accrued when the plaintiff first suffered its alleged breach of contract damages); <u>Terteling v. United States</u>, 167 Ct. Cl. 331, 338, 334 F.2d 250, 254 (1964). When a breach is only partial, each subsequent partial breach constitutes a new and separate claim, each with its own statute of limitations. <u>San Carlos Irrigation & Drainage Dist. v. United States</u> (San Carlos), 23 Cl. Ct. 276, 280 (1991); <u>see</u> Restatement (Second) of Contracts § 236 cmt. a ("Every

38

breach gives rise to a claim for damages."). When a breach of contract claim is based on repudiation, the claim accrues either at the time of repudiation--if the non-breaching party chooses to treat the repudiation as a present breach--or at the time when performance is due--if the nonbreaching party chooses to await performance. Franconia Assocs. v. United States (Franconia), 536 U.S. 129, 144 (2002) (citing 1 C. Corman, Limitation of Actions § 7.2.1 (1991)).

Defendant argues that the statute of limitations bars plaintiff's claims one through four and six because "Westlands has alleged that the Government breached its contractual obligations . . . beginning in 1986" but "did not file suit until January 6, 2012." Def.'s Mot. 10. Plaintiff responds, "Because the Government's time for performance was indefinite and necessarily took time to complete, and because the Government continuously assured Westlands that performance would be forthcoming, no cause of action accrued until the Government made clear its intent to abandon its drainage obligation in September 2010 with the Feinstein Letter." Pl.'s Resp. 28. Defendant replies that the theory of accrual articulated by plaintiff in its Response "is based only upon the Government's alleged 'repudiation' of its purported contractual obligation to provide drainage," and, therefore, plaintiff "has abandoned any other theory on the time and manner by which it alleges breach occurred." Def.'s Reply 3.

Plaintiff's accrual argument appears to be based, at least in part, on the finding of the Westlands I court that payments pursuant to the 1963 Contract of the fifty-cent drainage rate component did not have to be applied to drainage costs in the same year in which they were collected. See Pl.'s Resp. 39 (citing Westlands I, 134 F. Supp. 2d at 1157 n.98). Plaintiff appears to reason that, because drainage component charges could potentially be applied to drainage service in a later year, there was "no date in the past when it can be said the Government's duty of immediate performance arose." See id. at 40. In other words, plaintiff contends that defendant's performance under the contract is not yet due. Under this line of reasoning, however, plaintiff's breach of contract claims can only be brought under a theory of repudiation. Cf. Franconia Assocs., 536 U.S. at 144 (stating that a claim based on repudiation occurs at the time of repudiation if the non-breaching party elects to treat the repudiation as a present breach); Brighton Vill. Assocs., 52 F.3d at 1060 (stating that a breach of contract claim arises when "a plaintiff has done all he must do to establish his entitlement to [performance] and the defendant does not [perform]"). Therefore, defendant is correct that certain language used by plaintiff in its Response, see, e.g., Pl.'s Resp. 28 (stating that "no cause of action accrued until the Government made clear its intent to abandon its drainage obligation in September 2010 with the Feinstein Letter"), appears to indicate that plaintiff has abandoned its breach of contract claims based on theories other than repudiation. However, plaintiff also repeats in its Response allegations of "continuous breach" of the purported drainage obligation since at least 1986--allegations that imply that defendant's performance of the purported contractual obligation was due by 1986. See Pl.'s Resp. 43 (internal quotation marks

39

omitted).  Because plaintiff's allegations are conflicting, it is unclear whether plaintiff has abandoned its breach of contract claims based on theories other than repudiation. Accordingly, the court addresses each of plaintiff's claims, including those based on theories other than repudiation.

        a.        Claims One and Two:  Past Breaches of Express and Implied Contracts

        i.        1963 Contract, 1965 Repayment Contract and Any Implied Contract

A claim for breach of contract based on a failure to act first accrues when:  (1) performance is due, see Brighton Vill. Assocs., 52 F.3d at 1060, and (2) the plaintiff suffers damages as a result of nonperformance, see Alder Terrace, Inc., 161 F.3d at 1377 (finding that claim accrued when the plaintiff first suffered its alleged breach of contract damages); Terteling, 167 Ct. Cl. at 338, 334 F.2d at 254.  Plaintiff appears to contend that, because it had performed all conditions precedent by timely paying drainage components, Compl. ¶¶ 134, 140, continuing performance of the government's purported contractual drainage obligation was due in 1986, when drainage service was cut off, see id. ¶¶ 133 ("The United States has continuously breached [its contractual drainage] obligation by providing inadequate drainage facilities and services, and since at least 1986 by providing no drainage facilities or services at all"), 139 (same with respect to implied contract claim); see also Pl.'s Resp. 43.  But see Pl.'s Resp. 40 ("[T]here was no breach of [the government's drainage] obligation sufficient to trigger the running of the Statute of Limitations . . . until it became clear [that] no drainage would be forthcoming.").  Further, based on the facts pleaded, the damages or injuries alleged by plaintiff as a result of the government's purported breaches of a contractual drainage obligation generally were first suffered prior to 2006.  These injuries include:  paying for drainage facilities that were not built, paying for drainage services that were not delivered, paying for drainage facilities that have not functioned as required, paying for drainage services not of the quality and functionality required, paying more for delayed construction owing to inflation, paying for facilities, operations and services in anticipation of the contemplated drainage system that are now of diminished value, paying mitigation expenses and being forced to retire or fallow significant portions of land owing to the lack of drainage, and being deprived of the value of the contemplated drainage system.  Compl. ¶ 130.  The accrual date for each of these injuries is considered below.

Significantly, Westlands has been making the drainage component payments about which it complains since 1979.  Id. ¶ 40.  At that time, all drainage construction contemplated by the contracts had already been completed or suspended.  Specifically, construction of the interceptor drain was suspended in 1975.  See id. ¶ 51.  Phases two and three of construction contemplated by the 1965 Repayment Contract were suspended in or about 1978.  See id. ¶ 54.  Therefore, plaintiff's alleged injuries with respect to

40

payment for facilities that were not built or that have not functioned as required arguably first accrued as early as 1979. Cf. Alder Terrace, Inc., 161 F.3d at 1377. Plaintiff has also been deprived of the value of the contemplated drainage system since at least 1978, when the second and third phases of construction were suspended. Compl. ¶ 54. Further, plaintiff's alleged injury of paying for drainage services not of the quality and functionality required would have first accrued by 1986, at the latest, because the drainage services Westlands received from 1979 through 1985 ended in 1986, see Compl. ¶¶ 58, 63-64, and no drainage has otherwise been provided since then, see id. ¶ 67; cf. Alder Terrace, Inc., 161 F.3d at 1377. Similarly, plaintiff's alleged injury of paying for drainage services that were not delivered appears to have first accrued in 1986, when plaintiff was first paying a drainage rate component but receiving no service. See Compl. ¶¶ 40, 67; cf. Alder Terrace, Inc., 161 F.3d at 1377. Additionally, the only actual costs of drainage construction plaintiff has paid were pursuant to the 1965 Repayment Contract for construction completed in 1979. See supra pp. 35 (explaining that "plaintiff's payments under the 1965 Repayment Contract were payments for performance already rendered"), 37 (explaining that "all repayments made by plaintiff pursuant to the 1965 Repayment Contract were for construction completed by 1979"). Any injury related to inflated construction costs repayable under that contract would have first accrued in 1979, when payments began. Cf. Alder Terrace, Inc., 161 F.3d at 1377. Lastly, plaintiff does not state when it first made other expenditures in anticipation of the contemplated drainage system, paid mitigation expenses and retired or fallowed significant portions of land owing to the lack of drainage. However, these are all alleged injuries stemming from a lack of drainage, and Westlands stopped receiving drainage in 1986. Therefore-- based on the facts contained in plaintiff's pleadings--all the events that would fix the liability of the government with regard to any breach of the 1963 Contract, the 1965 Repayment Contract or any implied contract would have occurred before 2006, outside the limitations period. See 28 U.S.C. § 2501 (providing for six-year statute of limitations); cf. Brighton Vill. Assocs., 52 F.3d at 1060 (stating that a claim first accrues "'when all the events have occurred which fix the liability of the Government and entitle the claimant to institute an action'" (quoting Kinsey, 852 F.2d at 557)).

Plaintiff argues, however, that "even if the statute of limitations has run on some portion of Westlands' breach of contract claims . . . it has not run on damages suffered within six years of the filing of the complaint" pursuant to a partial breach theory or the continuing claims doctrine or both. Pl.'s Resp. 40 (capitalization and emphasis omitted); id. at 46. When a party sues for a partial breach, the party seeks damages for only part of its remaining rights to performance under the contract. Restatement (Second) of Contracts § 236(2); see, e.g., Yankee Atomic Electric Co. v. United States, 536 F.3d 1268, 1271-73 (Fed. Cir. 2008) (finding a partial breach when the government failed to remove radioactive waste over a twelve-year period after the contracting party had made the necessary contractual payments for removal and disposal). Each time a partial breach

of contract occurs, a new claim accrues with its own statute of limitations. San Carlos, 23 Cl. Ct. at 280.

In San Carlos, for example, a case relied upon by plaintiff in support of its partial breach theory, see Pl.'s Resp. 42, the government's failure to maintain a reservoir's spillway gates led to two minor overflows of the reservoir, San Carlos, 23 Cl. Ct. at 277-78. The San Carlos Irrigation and Drainage District sued the government for breach of a contractual duty to maintain the irrigation works, pursuant to a repayment contract. Id. at 278. The San Carlos court held that each minor overflow was a partial breach of the government's continuous duty to maintain the spillways and, although the first overflow was outside the statute of limitations, the second overflow was not time-barred because, as a partial breach, it constituted a newly accrued claim. Id. at 280-82.

Plaintiff argues that because the purported contractual drainage obligation owed by the government is "continuing," any partial breaches "occurring within the limitations period are not time-barred, even though breaches also occurred outside the period." Pl.'s Resp. 42. However, plaintiff fails to explain how any specific facts pleaded would support a finding of partial breach, instead relying on its allegations that the government's breach has been "continuous" and merely reciting the facts and findings in San Carlos, without explaining how that case supports its argument. See id. at 42-44. To the extent that any reports or schedules filed in connection with the Firebaugh litigation and any failures to act in accordance with any of these documents, the 2010 Feinstein Letter, unsuccessful repayment contract negotiations--or any other events alleged in the pleadings to have occurred after January 6, 2006--can be understood to be alleged as partial breaches, see Compl. ¶¶ 102-18, 122-27; Pl.'s Resp. 43-45, such claims would survive the statute of limitations, see 28 U.S.C. § 2501. Nevertheless, because plaintiff has failed to show any drainage obligation arising from the 1963 Contract, 1965 Repayment Contract or any implied contract that potentially could be breached by such actions, see supra Part III.A.1, these claims do not survive defendant's motion.

With respect to plaintiff's continuing claims argument, the continuing claims doctrine also allows new and independent breaches by the government to be treated as separate causes of action--each with its own statute of limitations.[17] See Boling, 220 F.3d

---

[17] The continuing claims doctrine has not been consistently recognized in this court. See Sankey v. United States, 22 Cl. Ct. 743, 746 (1991) ("This court no longer recognizes the continuing claims doctrine." (citing Hart v. United States, 910 F.2d 815, 817 (Fed. Cir. 1990))). Nonetheless, it is currently recognized and applied. See Nicholas v. United States, 42 Fed. Cl. 373, 377 (1998) (concluding that the rejection of the continuing claims doctrine in Hart had been abrogated by the decision of the United States Supreme Court (Supreme Court) in Bay Area Laundry & Dry Cleaning Pension Trust Fund v. Ferbar Corp of Cal., Inc., 522 U.S. 192 (1997)); see, e.g., Hatter v. United States, 203 F.3d 795, 799 (Fed. Cir. 2000) (describing requirements for

at 1373-74.  Therefore, a continuing claim is similar to a partial breach in that it allows some claims to survive the statute of limitations; however, it is distinguishable in that it is narrower and generally applies to a series of continuing breaches of a systematic duty rather than to isolated partial breaches of a continuing contract.  See San Carlos, 23 Cl. Ct. at 280 (distinguishing a continuing breach from partial breaches of a continuing contract).

For the continuing claims doctrine to apply, (1) the case must turn on pure issues of law (or specific issues of fact to be decided by the court for itself); (2) any facts involved must be "sharp and narrow"; and (3) no discretionary agency decision can be at issue.  Hatter v. United States, 203 F.3d 795, 799 (Fed. Cir. 2000) (citing Friedman v. United States, 159 Ct. Cl. 1, 6-8, 310 F.2d 381, 384-85 (1962)), aff'd in part and rev'd in part on other grounds, 532 U.S. 557 (2001).  Claims to which the continuing claims doctrine have been applied have been characterized as "inherently susceptible to being broken down into a series of independent and distinct events or wrongs, each having its own associated damages."  Brown Park Estates-Fairfield Dev. Co. v. United States (Brown Park), 127 F.3d 1449, 1457-58 (Fed. Cir. 1997).  For example, when a plaintiff has an absolute statutory or contractual right to periodic payments (independent of discretionary administrative action), a new claim accrues pursuant to the continuing claims doctrine with each failure to make a proper payment when it is due.  See Hatter, 203 F.3d at 799-800; Brown Park, 127 F.3d at 1457-58; Friedman, 159 Ct. Cl. at 6-8, 310 F.2d at 384-85.

In contrast, "a claim based upon a single distinct event, which may have continued ill effects later on, is not a continuing claim."  Brown Park, 127 F.3d at 1456; Harvest Inst. Freedman Fed'n v. United States, 80 Fed. Cl. 197, 200 (2008).  Nor is the continuing claims doctrine applicable when all the events necessary to the claim occurred outside the statute of limitations, more than six years before the claim was brought.  See, e.g., Dalles Irrigation Dist. v. United States, 88 Fed. Cl. 601, 612-13 (2009) (finding that an alleged breach by the Bureau of Reclamation of its duty to grant surplus credits for historical overcharges was not renewed each year because all events to fix liability would have occurred the first time such a credit was not granted); cf. Brighton Vill. Assocs., 52 F.3d at 1060 (stating that a claim first accrues "'when all the events have occurred which fix the liability of the Government and entitle the claimant to institute an action.'" (quoting Kinsey, 852 F.2d at 557)).

To the extent that plaintiff may be understood to argue that the Feinstein Letter (or other events alleged in the pleadings to have occurred after January 6, 2006) constituted new and independent breaches to which the continuing claims doctrine would be

---

continuing claims doctrine to apply) (citing Friedman v. United States, 159 Ct. Cl. 1, 6-8, 310 F.2d 381, 384-85 (1962)), aff'd in part and rev'd in part on other grounds, 532 U.S. 557 (2001).

applicable, see Pl.'s Resp. 43-45, such an argument fails. With respect to the first two requirements for the continuing claims doctrine, the court could infer an argument--based on plaintiff's statement that "the written agreements unambiguously establish a drainage obligation, but [Westlands] has not yet moved for summary judgment presenting that issue," Pl.'s Resp. 16 n.6--that the case turns only on pure issues of law or specific, "sharp and narrow" issues of fact to be decided by the court for itself, cf. Hatter, 203 F.3d at 799 (listing, inter alia, whether the case "turn[s] on pure issues of law or specific facts which the court is to decide for itself" and whether it requires the court to "resolve sharp and narrow factual issues" as factors to consider in determining whether the continuing claims doctrine applies); Friedman, 159 Ct. Cl. at 7, 310 F.2d at 384-85 (same). Nonetheless, the continuing claims doctrine is inapplicable because plaintiff concedes that this is a case involving agency discretion. See Compl. ¶ 88 (stating that, pursuant to Firebaugh, the government has discretion to determine how to provide drainage service to Westlands); cf. Hatter, 203 F.3d at 797-98 (stating that the continuing claims doctrine does not apply in cases involving agency discretion); Friedman, 159 Ct. Cl. at 6-8, 310 F.2d at 384-85 (same).

Further, unlike the periodic payment cases, this is not a case where a plaintiff has alleged a right to a series of periodic performances by defendant. Cf. Hatter, 203 F.3d at 799-800; Brown Park, 127 F.3d at 1457-58; Friedman, 159 Ct. Cl. at 6-8, 310 F.2d at 384-85. Instead, plaintiff states that although it owed "periodic drainage payments" pursuant to the 1963 Contract and 1965 Repayment Contract, neither contract "provide[d] a definite time for the Government to provide a complete drainage system, or even discrete segments of one"--in other words, that no "reciprocal" periodic performance was due from defendant. Pl.'s Resp. 38-39. In addition, the injuries alleged by plaintiff stem from the continued ill effects of suspension in or around 1978 of phases two and three of the construction contemplated by the 1965 Repayment Contract and the 1986 closing of the limited drainage provided to Westlands. See supra pp. 40-41 (discussing when injuries complained of by plaintiff first accrued); Pl.'s Resp. 45-46 (listing injuries and stating that "Westlands suffered substantial damages from the Government's continuing failure to provide drainage during the six years prior to the filing of the Complaint"); cf. Brown Park, 127 F.3d at 1456 (stating that the continuing claims doctrine does not apply to claims based on the continuing effects of a single, distinct event).

Finally, all of the events necessary to fix liability for plaintiff's breach of contract claims occurred outside the statute of limitations, that is, before January 6, 2006. Cf. Brighton Vill. Assocs., 52 F.3d at 1060 (stating that a claim first accrues "when all the events have occurred which fix the liability of the Government and entitle the claimant to institute an action." (internal quotation marks omitted)); Dalles Irrigation Dist., 88 Fed. Cl. at 612-13 (finding that an alleged breach by the Bureau of Reclamation of its duty to grant surplus credits for historical overcharges was not renewed each year because all events to fix liability would have occurred the first time such a credit was not granted).

The continuing claims doctrine is therefore inapplicable to plaintiff's breach of contract claims.[18]

ii.      2007 and 2010 Interim Contracts

With respect to the 2007 and 2010 Interim Contracts, plaintiff does not allege any specific instances of breach, but instead states that the contracts "carried forward" the purported drainage obligation, Pl.'s Resp. 14 (capitalization and emphasis omitted); see id. at 16, which it claims has been "continuously breached . . . since at least 1986," Compl. ¶ 133. To the extent that any of the events alleged in the pleadings to have occurred after January 6, 2006 can be understood to be alleged as breaches of the 2007 Interim Contract or 2010 Interim Contract, such claims would survive the statute of limitations. See 28 U.S.C. § 2501. Still, because plaintiff has failed to show any duty arising from those contracts that potentially could be breached by such actions, see supra Part III.A.1a.iii-iv, these claims do not survive defendant's motion.

b.      Claim Three:  Breach of the Implied Obligation of Good Faith and Fair Dealing

---

[18] Plaintiff also cites Franconia Assocs. v. United States (Franconia), 536 U.S. 129 (2002), which it claims is "instructive" for purposes of its continuing claims argument, Pl.'s Resp. 41-42. However, the Supreme Court in that case considered when a breach of contract claim accrued in the case of repudiation by the government, not whether the continuing claims doctrine applied. See Franconia, 536 U.S. at 149. Specifically, in Franconia the government's contractual obligation to accept prepayment on certain loans was repudiated by statute. Id. at 143-44. The government argued that the plaintiffs' claims first accrued when the statute was passed, nine years before the case was filed, and that, therefore, the plaintiffs' claims were barred by the statute of limitations. See id. at 138-39. The Court rejected the government's argument that a repudiation claim against the government accrues at the time of repudiation, stating the general rule that, when a party repudiates a contractual duty, the time when a claim accrues depends on whether the party chooses to treat the repudiation as a present breach or waits until the time for performance is due. Id. at 144-45. The court concluded that because the plaintiffs had not treated the passage of the statute as a present breach, no claim accrued until prepayment was attempted--because only then would government performance of the obligation to accept prepayments be due. Id. at 143. Therefore, the Court held that a plaintiff's claim was timely if filed within six years of that plaintiff's tender of a rejected prepayment. Id. at 149. It did not consider whether, with respect to a plaintiff's prepayments tendered more than six years before the suit was filed, claims by the same plaintiff for later tendered prepayments might be saved under the continuing claims doctrine.

Plaintiff fails to explain how Franconia relates to its continuing claims argument, and the court can discern no support for plaintiff's argument in the case.

45

A breach of the implied obligation of good faith and fair dealing occurs when a party acts in a way "specifically designed to reappropriate the benefits the other party expected to obtain from [the contract], thereby abrogating [its] obligations under the contract." Precision Pine, 596 F.3d at 829 (citing Centex, 395 F.3d at 1311). Plaintiff alleges that the government breached this obligation with respect to a purported drainage duty arising under the 1963 Contract, 1965 Repayment Contract, 2007 Interim Contract, 2010 Interim Contract and any implied contract by: not timely designing, developing and implementing a plan for adequate drainage--both initially and in response to court orders in Firebaugh and Sumner Peck--and failing to devote adequate resources and to seek necessary appropriations from Congress for these tasks; abandoning its original drainage plan and "any effort to provide drainage to the entire San Luis Unit and all of the lands in Westlands' service area in need of drainage"; designing and constructing an inadequate drainage system that led to the closing of the Kesterton Reservoir; closing the completed portion of the interceptor drain; "and ultimately abandoning its obligation altogether" in the Feinstein Letter. Compl. ¶ 147.

To the extent that any of these alleged breaches of the implied obligation of good faith and fair dealing took place after January 6, 2006, these claims would survive the statute of limitations. See 28 U.S.C. § 2501. However, because plaintiff has failed to show any contractual drainage obligation to which the implied obligation of good faith and fair dealing could attach, see supra Part III.A.2.a, these claims do not survive defendant's motion.

c.      Claim Four: Total Breach

Plaintiff argues that the statute of limitations has not yet run on its claims for total breach because plaintiff has only now elected to sue for total breach based on defendant's "accumulated failures to perform." Pl.'s Resp. 37-38. When a party to a contract is in total breach, the non-breaching party may "elect to declare the contract terminated and sue for total breach or to continue the contract and sue for partial breach." PG&E, 70 Fed. Cl. at 771; Cities Serv. Helex, Inc., 211 Ct. Cl. at 234-35, 543 F.2d at 1313. If the nonbreaching party elects to continue performance under the contract, it is precluded from later suing for total breach. See PG&E, 70 Fed. Cl. at 771 (deriving from Hansen, 367 F.3d at 1309, that restitution damages for total breach and damages for partial breach are "inconsistent and incompatible remedies"). If the party elects to sue for total breach, the claim accrues at the time of the total breach. See Brighton Vill. Assocs., 52 F.3d at 1060 (stating that a claim accrues "'when all the events have occurred which fix the liability of the Government and entitle the claimant to institute an action'" (quoting Kinsey, 852 F.2d at 557)).

Plaintiff's argument that the statute of limitations has not yet run on its claim for total breach appears to be based on plaintiff's contention that "the Government's time to

46

satisfy its duty to provide drainage was indefinite." Pl.'s Resp. 38-39. As discussed above, plaintiff appears to reason, based on the finding of the Westlands I court that drainage component payments could be applied to service in later years, that no immediate obligation to perform the purported drainage obligation arose until it was no longer reasonable for plaintiff to believe that such performance would be forthcoming. See supra Part III.B.1; Pl.'s Resp. 39-40. To the extent that the court can construe plaintiff's assertion that "it finally became clear that the Government would never provide the drainage facilities required by the Contracts" in 2010, Pl.'s Resp. 40, as an allegation of total breach based on this theory, such a claim would have accrued in 2010 and would not be barred by the statute of limitations, see 28 U.S.C. § 2501; cf. Brighton Vill. Assocs., 52 F.3d at 1060 (stating that a claim accrues "when all the events have occurred which fix the liability of the Government and entitle the claimant to institute an action" (internal quotation marks omitted)). However, in making its case that the statute of limitations has not run on its claim for total breach, plaintiff undermines this claim by what appears to be a retraction of it, stating simply that "there was no breach." Pl.'s Resp. 40. While such a statement is consistent with plaintiff's accrual theory based on repudiation, see infra Part III.B.1.d; cf. Franconia, 536 U.S. at 143 ("[T]he promisor's renunciation of a 'contractual duty before the time fixed in the contract for . . . performance' is a repudiation." (emphasis in original) (quoting 4 Corbin, Contracts § 959 (1951))), it is inconsistent with a claim for total breach. Either way, plaintiff has not stated a claim for total breach on which relief can be granted because plaintiff has not shown any right to remaining performance of a contractual drainage obligation and plaintiff has accepted performance under the contracts, precluding such a claim. See supra Part III.A.2.b.

d.      Claim Five:  Anticipatory Breach

When a breach of contract claim is based on anticipatory breach, also known as repudiation, the claim accrues either at the time of repudiation--if the non-breaching party chooses to treat the repudiation as a present breach--or at the time when performance is due--if the nonbreaching party chooses to await performance. Franconia, 536 U.S. at 144; see Kinsey, 852 F.2d at 558. Defendant concedes that the court has jurisdiction over plaintiff's claim for anticipatory breach. Def.'s Mot. 10. The court must nevertheless determine whether such jurisdiction exists. See Steel Co., 523 U.S. at 94-95; PODS, Inc., 484 F.3d at 1365. As discussed above, plaintiff contends that performance of the purported drainage obligation was never due. See supra Part III.B.1.c; cf. Franconia, 536 U.S. at 143 (stating that a renunciation of a contractual duty before it is due is a repudiation). Thus, plaintiff's claim for anticipatory breach would have accrued at the time of the alleged repudiation. Cf. Franconia, 536 U.S. at 144.

In its Complaint, plaintiff identifies a number of events that it alleges constituted anticipatory breaches, specifically: "express and implied repudiation of an intent to

47

implement the 2007 record of decision," "implied repudiation demonstrated by the Government's course of conduct" in failing to provide actual drainage since 1986, and the "demonstrated (and indeed professed) inability of the government to provide drainage, as most recently exemplified in the Feinstein Letter." Compl. ¶ 158. To the extent that plaintiff can be understood to allege that a drainage obligation pursuant to the 1963 Contract, 1965 Repayment Contract or any implied contract was repudiated by defendant's actions in 1986--or at any other time before January 6, 2006--such a claim would be time-barred. See 28 U.S.C. § 2501. However, in its Response, plaintiff states that the statute of limitations did not begin to run on any of its claims "until the Government made clear its intent to abandon its drainage obligation in September of 2010 with the Feinstein letter." Pl.'s Resp. 28. To the extent that this statement may be understood to retract any allegations of repudiation prior to the Feinstein Letter, plaintiff's claim of repudiation of a contractual drainage obligation would be viewed as having allegedly occurred in 2010 and would survive the statute of limitations. However, because plaintiff has shown neither that such a contractual drainage obligation existed to be repudiated nor that the Feinstein Letter constituted a repudiation, this claims fails to survive defendant's motion. See supra Part III.A.2.c.

e.      Claim Six:  Declaratory Relief

Because "claims for declaratory relief necessarily derive from claims for substantive relief," the statute of limitations for the underlying action at law generally is applied to an accompanying action for declaratory relief. 26 C.J.S. Declaratory Judgments § 120 (2012). Here, plaintiff requests that, in the event that it is not granted money damages for its claims one through five, it be granted declaratory judgment "adjusting [for inflation] its obligation to pay for construction of a drainage system under the 1965 Repayment Contract or similar contracts to be executed in the future." Compl. ¶ 165; see id. at 52.[19] Plaintiff argues that such relief is warranted because of the "escalation in construction costs . . . due to the Government's breach of its obligation to build the required drainage system in a timely manner." Id. ¶ 171.

To the extent that plaintiff's claims of breach of a contractual drainage obligation survive the statute of limitations, see supra Parts III.B.1.a-d, plaintiff's claim for declaratory relief derived from those claims also survives the statute of limitations, see 26 C.J.S. Declaratory Judgments § 120. However, as discussed above, plaintiff has failed to state a claim for declaratory judgment on which relief can be granted. See supra Part III.A.3. Further, plaintiff's claim for declaratory relief is not within the court's subject matter jurisdiction, as explained below. See infra Part. III.B.2.

---

[19] The court cites to plaintiff's Prayer for Relief, which appears on pages fifty-one and fifty-two of its Complaint, by page number rather than paragraph number.

48

2. This Court Lacks Jurisdiction to Grant the Declaratory Relief Sought by Plaintiff

Plaintiff requests two types of declaratory judgment. First, plaintiff requests that, in the alternative to money damages pursuant to claims one through five, the court grant declaratory judgment pursuant to claim six, adjusting plaintiff's payment obligations related to drainage construction costs "based on inflation adjusted dollars going back to the period when the work should have been done." Compl. 52; see Pl.'s Resp. 46-47. Plaintiff also seeks declaratory relief in connection with claims four and five of the severability of defendant's contractual obligation to provide water service from its alleged contractual obligation to provide drainage, Pl.'s Resp. 46; see Compl. ¶¶ 156, 163, and an accompanying declaration that, while defendant remains obligated under its water supply contracts to supply water to Westlands and is required in good faith to negotiate for a long-term extension, plaintiff is "relieved of all further responsibility to pay for drainage services or facilities under its contracts" with defendant, both now and in future contracts extending water service, Compl. 51. Defendant argues that "Westlands'[] requests for declaratory relief are not within the jurisdiction of this Court because they are distinct from any claim for money damages and are prospective in nature." Def.'s Reply 5.

Declaratory relief, with respect to a breach of contract claim such as this one, is only within the court's jurisdiction if (1) declaratory judgment is "necessary to the resolution of a claim for money presently due and owing," Hydrothermal, 26 Cl. Ct. at 16, or (2) the declaratory judgment, "as an incident of and collateral to" a money judgment, "direct[s] restoration to office or position, placement in appropriate duty or retirement status, [or] correction of applicable records," 28 U.S.C. § 1491(a)(2). Declaratory relief is prospective, and therefore beyond the court's jurisdiction, if the consequences of adjudication would flow through the contractual scheme governing the party's relationship and have a future impact on that relationship. See Katz v. Cisneros, 16 F.3d 1204, 1209 (Fed. Cir. 1994).

Plaintiff argues that "'[t]he test for determining if a case belongs in the Claims Court is whether or not the 'prime objective' or 'essential purpose' of the complaining party is to obtain money from the federal government.'" Pl.'s Resp. 48 (quoting Eagle-Picher Indus., Inc. v. United States (Eagle-Picher) 901 F.2d 1530, 1532 (10th Cir. 1990)). Although government contracts claims generally can be brought in either the Court of Federal Claims or district court, the Court of Federal Claims has exclusive jurisdiction when the amount of the claim against the United States exceeds ten thousand dollars. 28 U.S.C. § 1346(a)(2) (2006). Here, the test discussed by plaintiff is the test used to determine whether the Court of Federal Claims (or its predecessor, the Claims Court) has exclusive jurisdiction over a suit, such that it could not be brought in district court--not whether the court has subject matter jurisdiction over a particular claim alleged in a suit.

49

See Eagle-Picher, 901 F.2d at 1532 ("'A party may not circumvent the Claims Court's exclusive jurisdiction by framing a complaint in the district court as one seeking injunctive, declaratory or mandatory relief where the thrust of the suit is to obtain money from the United States.'" (quoting Rogers v. Ink, 766 F.2d 430, 434 (10th Cir. 1985)); 28 U.S.C. § 1346(a)(2).

Plaintiff, apparently misunderstanding the purpose of this test, mistakenly places its reliance on cases in which an appeals court found that the Court of Federal Claims or the Claims Court had exclusive jurisdiction over a suit despite the inclusion of claims for declaratory or injunctive relief. Specifically, plaintiff compares its claim six to the facts of Colorado Department of Highways v. U.S. Department of Transportation (Colorado DOH), 840 F.2d 753 (10th Cir. 1988), and Brazos Electric Power Cooperative, Inc. v. United States (Brazos Electric), 144 F.3d 784 (Fed. Cir. 1998). See Pl.'s Resp. 49. In Colorado DOH, the plaintiff and intervenor sought money damages for purported overcharges as a result of an allegedly incorrect accounting method and also sought an injunction against the use of that accounting method in the future. Colorado DOH, 840 F.2d at 754-55. The United States Court of Appeals for the Tenth Circuit (Tenth Circuit) ordered the district court to dismiss the complaint for lack of jurisdiction, finding that the Claims Court had exclusive jurisdiction over the suit because (1) it was brought against the United States, (2) was based on a government contract and (3) was for money damages exceeding $10,000--even though it also sought injunctive relief. Id. at 756-57 (citing Rogers, 766 F.2d at 433); cf. 28 U.S.C. § 1346(a)(2). The Tenth Circuit did not hold that the Claims Court could grant the injunctive relief requested--only that the district court did not have jurisdiction to hear the case. Similarly, in Brazos Electric, the Federal Circuit affirmed a transfer order of the district court (ordering the case transferred to the Court of Federal Claims) because the plaintiff sought a cancellation of a debt owed to the federal government in excess of ten thousand dollars. Brazos Electric, 144 F.3d at 785-87. The Federal Circuit rejected the plaintiff's characterization of its claim as one for "the equitable relief of a declaration of rights and an injunction." Id. at 786. Instead, the Federal Circuit reasoned that the result of the judgment sought--that a prepayment penalty would either be refunded or credited toward the plaintiff's other debt--was "just as much a form of monetary damages for purposes of the Tucker Act as the direct payment by the federal government of conventional money damages." Id. at 787.

Relying on these cases, plaintiff first asserts that "[l]ike the relief sought in Colorado [DOH], the relief sought here would affect how reimbursements to the Government were calculated in the future." Pl.'s Resp. 49. Plaintiff continues that, "like the relief sought in Brazos [Electric], the relief sought here would relieve Westlands of an obligation to pay the Government a portion of what the Government intends to charge for construction of the drainage system." Id. However, plaintiff's comparisons are inapt. The Tenth Circuit's decision in Colorado DOH was based on the fact that the plaintiff and intervenor in that case claimed presently due and owing money damages in excess of

ten thousand dollars--and in fact were awarded $845,454.05 and $4,816,772.21, respectively. Colorado DOH, 840 F.2d at 755. Because the money damages claimed exceeded ten thousand dollars, the district court lacked jurisdiction over the entire case, even though the plaintiff and intervenor also sought injunctive relief. See id. at 755-56; cf. 28 U.S.C. § 1346(a)(2). The Tenth Circuit did not hold that the Court of Federal Claims had jurisdiction to grant declaratory judgment as to how reimbursements would be calculated in the future--making plaintiff's reliance on this case misplaced. Similarly, the court's decision in Brazos Electric turned on the fact that the plaintiff sought a refund that was presently due and owing in the amount of approximately $16.5 million. See Brazos Electric, 144 F.3d at 789. Although the plaintiff characterized its claim as one for injunctive and declaratory relief, the Federal Circuit held that it was actually a claim for money damages in excess of ten thousand dollars. Id. at 787. These cases do not stand for the proposition that the Court of Federal Claims has jurisdiction to grant declaratory relief of the type sought by plaintiff and, therefore, do not support plaintiff's argument that the court has jurisdiction to grant such relief.

Indeed, plaintiff's claim six is asserted as an alternative to money damages, see Compl. 51-52, and, therefore, cannot be said to be necessary to the resolution of a claim for money presently due and owing, cf. Hydrothermal, 26 Cl. Ct. at 16. Instead, the claim is prospective because, as plaintiff states, "it would affect how reimbursements to the Government were calculated in the future," Pl.'s Resp. 49, meaning that the consequences of such a declaratory judgment would flow through the repayment contract scheme governing the party's relationship and have a future impact on that relationship, cf. Katz, 16 F.3d at 1209. In addition, the inflation-based adjustments plaintiff seeks fall outside the three narrow situations where declaratory relief may be available "as an incident of and collateral to" a money judgment because the requested declaratory relief cannot be characterized as a "restoration to office or position, placement in appropriate duty or retirement status, [or] correction of applicable records." Cf. 28 U.S.C. § 1491(a)(2).

With respect to plaintiff's requests for declaratory relief in connection with its fourth and fifth claims (total and anticipatory breach, respectively), plaintiff argues that such relief is necessary to the resolution of these claims because the claims "are conditioned on their not resulting in release of the Government's obligation to provide water." Pl.'s Resp. 48-49.

Plaintiff misunderstands what is meant by "necessary to the resolution of a claim for money damages presently due and owing." See Hydrothermal, 26 Cl. Ct. at 16. When a plaintiff sues for anticipatory repudiation or total breach, it declares the contract terminated and sues for damages that reflect its remaining rights to performance under the contract. See Cities Serv. Helex, Inc., 211 Ct. Cl. at 234-35, 543 F.2d at 1313; PG&E, 70 Fed. Cl. at 771. Here, however, plaintiff seeks to continue receiving water

51

service from defendant and so is unwilling to terminate its water service contracts. See Compl. ¶¶ 156, 163 (stating that plaintiff withdraws its fourth and fifth claims if the court does not declare that the government's water service obligation is severable from the purported drainage obligation). Moreover, with respect to plaintiff's total breach claim as it relates to past contracts, plaintiff's acceptance of part performance by taking water deliveries operates as a waiver of such claims. See supra Part III.A.2.b; cf. Mobil Oil, 530 U.S. at 622 ("[A]cceptance of performance under a once-repudiated contract can constitute a waiver of the right to restitution that repudiation would otherwise create."). Plaintiff seeks a declaration of severability to overcome these problems: such a declaration would allow plaintiff to continue receiving benefits of the contracts--water service--while suing for only part of the alleged remaining performance--the drainage obligation--and would avoid the problem of waiver. However, such a declaration is not necessary to the resolution of plaintiff's claims; it is necessary only for plaintiff to prevail on them in the way that it wants. See supra Parts III.A.2.b-c (discussing plaintiff's claims four and five); cf. Hydrothermal, 26 Cl. Ct. at 16.

In addition, the declarations sought by plaintiff in connection with its claims for total and anticipatory breach are prospective because they would result in relieving plaintiff of present and future responsibilities, impacting the contractual relationship between the parties in the future. See Compl. 51 (requesting a declaratory judgment that "Westlands is relieved of all further responsibility to pay for drainage services or facilities under its contracts with the United States, including . . . future extensions" of water service contracts) (emphasis added); cf. Katz, 16 F.3d at 1209. Lastly, such declaratory relief is not incidental or collateral to money damages because it does not constitute a "restoration to office or position, placement in appropriate duty or retirement status, [or] correction of applicable records." Cf. 28 U.S.C. § 1491(a)(2).

The court, therefore, holds that it lacks subject matter jurisdiction over plaintiff's requests for declaratory judgment, and that plaintiff's claim six and requests for declaratory relief with respect to claims four and five must be dismissed. Cf. RCFC 12(h)(3) (providing that the court must dismiss claims over which it lacks jurisdiction).

3.      Interest

Although plaintiff requested pre- and post-judgment interest in its Prayer for Relief, see Compl. 52, plaintiff has since conceded that the court lacks jurisdiction to grant this request, see Pl.'s Resp. 1; see also Def.'s Mot. 12 (arguing that the court lacks jurisdiction over plaintiff's interest claims). The court does not consider the issue further.

IV.     Conclusion

For the reasons stated, a number of plaintiff's claims are DISMISSED-IN-PART for lack of subject matter jurisdiction pursuant to RCFC 12(b)(1) and 12(h)(3). Specifically, the statute of limitations bars the portions of plaintiff's claim one with respect to past breaches of the 1963 Contract and 1965 Repayment Contract and plaintiff's claim two of past breach of an implied contract--except to the extent that plaintiff can be understood to allege that events identified in the pleadings and occurring after January 6, 2006 constituted partial breaches. See supra Part III.B.1.a.i. Similarly, the portions of plaintiff's claim one with respect to past breaches of the 2007 and 2010 Interim Contracts are time-barred--except to the extent that events identified in the pleadings and occurring after January 6, 2006 can be understood to be alleged as breaches of either or both of the 2007 Interim Contract or 2010 Interim Contract. See supra Part III.B.1.a.ii. Plaintiff's claim three also must be dismissed as outside the limitations period except to the extent that any of the alleged breaches of the implied obligation of good faith and fair dealing occurred after January 6, 2006. See supra Part III.B.1.b. And, to the extent that plaintiff can be understood to allege that defendant's actions in 1986, or any time prior to January 6, 2006, constituted a repudiation of a contractual drainage obligation, such portions of plaintiff's claim five would also be time-barred. See supra Part III.B.1.d.

Plaintiff's claim six for declaratory relief and requests for declaratory relief associated with claims four and five are DISMISSED because they are outside the court's limited authority to grant declaratory relief, see supra Part III.B.2, and, to the extent that they derive from plaintiff's time-barred claims, they are also time-barred, see supra Part III.B.1.e.

The remainder of plaintiff's claims are DISMISSED pursuant to RCFC 12(b)(6), for failure to state a claim upon which relief can be granted. See supra Part III.A.

Defendant's Motion is therefore GRANTED. Pursuant to this Opinion, the Clerk of Court is directed to enter judgment dismissing the case.

IT IS SO ORDERED.

s/ Emily C. Hewitt
EMILY C. HEWITT
Chief Judge

53

## EXHIBIT A

## Table of Contents

I.  Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

    A.  Creation of the San Luis Unit as Part of the
        Federal Reclamation Program . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

        1.  Relevant Federal Reclamation Laws . . . . . . . . . . . . . . . . . . . . . . . 3

        2.  Construction of the San Luis Unit . . . . . . . . . . . . . . . . . . . . . . . . 4

    B.  Contracts at Issue Between Westlands and the
        United States Government . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

        1.  1963 Water Service Contract . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

        2.  1965 Repayment Contract . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

        3.  2007 Interim Water Service Contract . . . . . . . . . . . . . . . . . . . . . . 8

        4.  2010 Interim Water Service Contract . . . . . . . . . . . . . . . . . . . . . . 9

II. Legal Standards . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

    A.  Jurisdiction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .10

    B.  Failure to State a Claim . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

    C.  Interpretation of Contract Terms . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

    D.  Issue Preclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

    E.  Declaratory Judgment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

III. Discussion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

    A.  Plaintiff Has Failed to State a Claim upon Which Relief Can Be Granted
        with Respect to Claims One Through Six . . . . . . . . . . . . . . . . . . . . . . . . 14

        1.  Claims One and Two:  Breach of Contract . . . . . . . . . . . . . . . . . . 15

a. Past Breaches of Express Contractual Obligation . . . . . . . . 15

i. 1963 Contract . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

a) Issue Preclusion . . . . . . . . . . . . . . . . . . . . . . . 16

b) Contract Terms . . . . . . . . . . . . . . . . . . . . . . . 19

ii. 1965 Repayment Contract . . . . . . . . . . . . . . . . . . . 22

iii. 2007 Interim Contract . . . . . . . . . . . . . . . . . . . . . . . 25

iv. 2010 Interim Contract . . . . . . . . . . . . . . . . . . . . . . . 28

b. Past Breaches of Implied Contractual Obligation . . . . . . . . 29

2. Claims Three to Five: Related Breach of Contract Claims . . . . . . 31

a. Breach of Implied Obligation of Good Faith and
Fair Dealing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

b. Total Breach of Contractual Drainage Obligations . . . . . . . 34

c. Anticipatory Breach of Contractual Drainage
Obligations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

3. Claim Six: Declaratory Relief Regarding Amounts to Be Paid
Under the 1965 Repayment Contract and Any Future
Repayment Contracts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

B. This Court Lacks Jurisdiction over Plaintiff's Claims, in Part . . . . . . . . . 38

1. Statute of Limitations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

a. Claims One and Two: Past Breaches of Express and
Implied Contracts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

i. 1963 Contract, 1965 Repayment Contract and Any
Implied Contract . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

ii. 2007 and 2010 Interim Contracts . . . . . . . . . . . . . . 45

55

    b.    Claim Three:  Breach of the Implied Obligation of Good
          Faith and Fair Dealing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

    c.    Claim Four:  Total Breach . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

    d.    Claim Five:  Anticipatory Breach  . . . . . . . . . . . . . . . . . . . . 47

    e.    Claim Six:  Declaratory Relief  . . . . . . . . . . . . . . . . . . . . . 48

  2.  This Court Lacks Jurisdiction to Grant the Declaratory Relief
      Sought by Plaintiff . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

  3.  Interest  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

IV.  Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52